Rebecca LADD, Plaintiff–Appellant,

v.

ITT CORPORATION and Metropolitan Life Insurance Company, Defendants–Appellees.

No. 97–4138.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1998.

Decided June 22, 1998.

Mark D. DeBofsky (argued), DeBofsky & DeBofsky, Chicago, IL, for Plaintiff–Appellant.

Thomas J. Piskorski, Joshua M. Henderson (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Before POSNER, Chief Judge, and COFFEY and EVANS, Circuit Judges.

POSNER, Chief Judge.

This is an ERISA suit to overturn the denial of Rebecca Ladd's claim for disability benefits under the employee welfare plan sponsored by her employer, ITT, and administered by MetLife. Since the plan authorized the plan administrator to use its discretion in making claims determinations, our

role is the limited one of determining whether MetLife abused its discretion—acted unreasonably—or, as the cases say (but all these are different ways of saying the same thing), exercised its discretion in an "arbitrary and capricious" manner. E.g., *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir.1998); *Brehmer v. Inland Steel Industries Pension Plan*, 114 F.3d 656, 660 (7th Cir.1997); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1450–51 (11th Cir.1997). If, however, the administrator has a conflict of interest, then, though the standard of review is nominally the same, the judicial inquiry is more searching. E.g., *id.; Hightshue v. AIG Life Ins. Co., supra*, 135 F.3d at 1147. ITT's plan is financed entirely by payroll deductions from the wages of the employees enrolled in it. MetLife functions only as a claims administrator, and not as an insurer. From these circumstances, it is tempting to infer that neither defendant has a conflict of interest in administering the plan—that if Ladd gets benefits, there will be a little less for other employees, and therefore no skin off ITT's hide. But this does not seem quite correct, since the plan summary given to employees does not condition benefits on the plan's having sufficient employee-contributed funds to cover them. The employee's entitlement is stated in absolute terms, implying that ITT would have to dig into its own pocket if claims exceeded contributions. This possibility might make MetLife inclined to resolve close cases against the claimant. But this issue has not been explored by the parties; we have no idea how large the plan's funds are or what provision has been made for the contingency of an excess of claims over funds. So we shall assume that neither defendant has any stake in MetLife's decision to deny Ladd the benefits she sought and therefore that the denial is entitled to undiluted deference by us—undiluted, that is, by concerns with conflicts of interest, but not unlimited. If without strain on our part the decision can fairly be described as arbitrary, we must reverse.

■ In 1993, Ladd, a 38–year–old customer service representative for ITT, sustained nerve damage to her neck and both wrists when a shelving unit fell on her at work. She sought total-disability benefits under the employee benefit plan, which required that she be "unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are qualified, or become reasonably qualified by training, education or experience." The wording is different from that of the statute governing social security disability benefits, which defines disability (so far as relevant here) as an "inability to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). But MetLife was unable to articulate any difference in actual meaning until the oral argument of the appeal, when its lawyer said that the reference to "any and every duty" means that an ITT employee is not disabled unless he or she can't even do part-time work, whereas (he thought) under the Social Security Act a worker who cannot work full time is deemed totally disabled. That is not what the Act says. As long as the worker can engage in "substantial gainful activity," he is not disabled even if the only work that he is capable of doing is only part time. E.g., *Brewer v. Chater*, 103 F.3d 1384, 1391–92 (7th Cir.1997); 20 C.F.R. § 404.1572(a). Of course, the work must not be so meager as not to be substantial and gainful. See 20 C.F.R. §§ 404.1573(e), 404.1574(a), (b). But the same, it turns out, is true under ITT's disability plan. For MetLife's lawyer quickly retreated from his effort to distinguish the plan from the social security disability law when asked whether a worker who could work ten minutes a day was thereby disentitled to total-disability benefits under the plan; he said no. Anyway his attempt comes much too late in the litigation to be considered. We shall proceed on the assumption that "total disability" under the plan means, at least insofar as Ladd's claim is concerned, the same thing as under the social security disability program. *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420–21 (11th Cir.1984); see also *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir.1988); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 n. 11 (7th Cir.1992).

■ As a result of the accident, Ladd came under the care of an orthopedic surgeon named Freitag, who diagnosed significant damage to Ladd's spinal disks, causing

severe pain, and carpal tunnel syndrome in both wrists, also causing severe pain and limiting the use of both of her hands and both wrists. Freitag pronounced her totally disabled from gainful employment. MetLife had Ladd examined in 1994 by a Dr. Holmes, who concurred in Freitag's evaluation (though Holmes thought that she *might* be able to work four hours a day, provided her work would not require her to turn her head a lot), as did another physician who examined her years later, Dr. Kurzydlowski. Freitag continued to treat and examine Ladd throughout the period relevant to this suit.

MetLife encouraged Ladd to apply for social security disability benefits, and even provided her with legal representation to assist her with the application. After a hearing, an administrative law judge found that Ladd was indeed totally disabled, and awarded her benefits. He noted that in addition to her disk problems and carpal tunnel syndrome, she was an insulin-dependent diabetic and also obese, and concluded that "the claimant's condition precludes her from performing even sedentary basic work activity."

MetLife's employee welfare plan entitles it to offset benefits under the plan by any social security disability benefits received by the employee. The plan is more generous than social security, so Ladd still had a claim against the plan even after she got her social security benefits. After she was awarded social security disability benefits, MetLife referred her file to a Dr. Bertrand, who works for a consulting firm, Network Medical Review Company, that MetLife uses extensively. Bertrand did not examine Ladd, but, using the criteria employed by the Social Security Administration, he concluded in a perfunctory report that Ladd had sufficient "residual functional capacities" to work a full eight-hour day at a sedentary job. Yet he also recommended that Ladd be examined by a neurosurgeon to "support or refute this [i.e., Bertrand's] assessment of her residual functional capacities." On the basis of Bertrand's report (and also a vocational assessment, but it was based on Bertrand's conclusion that Ladd is able to do sedentary work), and without taking his advice to have Ladd

examined by a neurosurgeon, MetLife denied Ladd's claim.

Several months later, after Ladd appealed the denial to a review board within MetLife and submitted additional medical evidence by Freitag and others indicating a further deterioration of her condition, Bertrand supplemented his report. He said that in preparing his original report he had talked with Freitag, who had told him that Ladd "could go back and try work. The restriction would specifically be that she would only be working the keyboard for 25 minutes out of every hour or breaks as needed. This was simply to be a work trial to see how this would work out for her." Bertrand adhered to his recommendation that Ladd's claim be denied, and the review board affirmed the denial, precipitating this litigation. Bertrand seemed troubled by the fact that Ladd is reluctant to undergo surgery for her back and wrist conditions because she has been warned that her diabetes would make surgery risky for her.

Shortly afterward, and rather fantastically as it seems to us, ITT offered Ladd a position as a security guard during the third shift (we assume this would be around midnight to 8 a.m.), in which she would have to make "watch rounds of premises outside of scheduled working hours," "check buildings, equipment and materials for leaks, fire, unauthorized individuals and other conditions," "ensure all entrances and windows are secured and that elevator and fire doors are closed," and "remain alert and on-site to deter unauthorized entry to property." She declined the offer of this job at the direction of her physician. It is difficult to believe that the offer was made in good faith; it was not among the jobs that the vocational assessor thought she might be able to perform if her medical condition was as Bertrand believed it to be.

In the circumstances that we have outlined, the denial of Ladd's claim must be adjudged arbitrary, and even irrational. No one who examined Ladd, including the doctor (Holmes) selected by MetLife to examine her, believed that she was capable of working. An administrative law judge of the Social Security Administration found that she

was totally disabled; and while the hearing on which his finding was based preceded Bertrand's paper evaluation by some months, the uncontradicted evidence is that Ladd's condition was worse when MetLife denied her claim than it had been when the Social Security Administration granted it. If Bertrand had given reasons for disagreeing with the assessments by Freitag, and Holmes, and Kurzydlowski, and the ALJ, we would have to affirm under the deferential standard. But far from giving reasons for disagreeing, he did not purport to disagree with anyone. He referred to Freitag, but only to misunderstand him; for it is evident from their conversation that all Freitag was suggesting was that Ladd be asked to work on a *trial* basis, a suggestion that the defendants never followed up on.

The grant of social security disability benefits to Ladd has an additional significance. It brings the case within the penumbra of the doctrine of judicial estoppel—that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. E.g., *McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir.1998); *Waldorf v. Shuta*, 142 F.3d 601, 615–16 (3d Cir.1998). The doctrine is technically not applicable here, because MetLife and ITT, the defendants in this suit, were not parties to the proceeding before the Social Security Administration. Yet they "prevailed" there in a practical sense because the grant of social security benefits to Ladd reduced the amount of her claim against the employee welfare plan. If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, *McNamara v. City of Chicago, supra*, 138 F.3d at 1225; *Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir.1998), we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration, going so far as to provide her with legal representation. To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated. In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.

The judgment is reversed with directions to enter judgment for the plaintiff.

REVERSED.