Stacey SHANE, Plaintiff,

v.

**ALBERTSON'S INC. EMPLOYEES'
DISABILITY PLAN, et al.,
Defendants.**

**No. CV 04–1087 AHM(CWX).**

United States District Court,
C.D. California.

July 26, 2005.

Glenn R. Kantor, Jennifer L. Kurzon, Tracy A. Collins, Kantor & Kantor, Northridge, CA, for Plaintiff.

Felicia A. Starr, Naomi Young, Teresa R. Tracy, Baker & Hostetler, Los Angeles,

CA, Jeffrey J. Droubay, W. Mark Gavre, Parsons Behle and Latimer, Salt Lake City, UT, for Defendants.

## ORDER OVERTURNING ADMINISTRATIVE DETERMINATION RE: ERISA BENEFITS

MATZ, District Judge.

Plaintiff Stacey Shane has sued defendants Albertson's Inc. Employees' Disability Plan (the "Disability Plan"), Life Insurance Plan, Medical and Dental Plan, and Employees' Benefit Pension Plan due to the termination of her long-term disability benefits ("LTD benefits"). The Disability Plan is a self-funded employee welfare benefit plan established by Albertson's, Inc., Ms. Shane's former employer. The contract administrator (the third-party administrator) of the Disability Plan is VPA, Inc.[1]

Defendants move to uphold the termination of plaintiff's LTD benefits. Plaintiff moves to overturn defendants' termination of those benefits.[2] The parties raise a number of disputes central to determining whether the termination of plaintiff's benefits was wrongful: *First*, the parties dispute which version of the plan, the 1993 or the 2002 version, applies. *Second*, plaintiff argues that the appropriate standard of review is *de novo* because, among other things, the Medical Review Committee (the "MRC")(the body which determined whether Ms. Shane was eligible for benefits) had no discretionary authority under the terms of the 1993 Plan.

Defendants argue that discretion was granted under either plan and that the proper standard of review is abuse of discretion. *Third*, the parties dispute whether, at the time of denial, Ms. Shane remained eligible for LTD benefits (*i.e.*, whether she was "totally disabled" under the terms of the governing plan).

I find that the 1993 Plan applies; that the *de novo* standard of review is appropriate because authority was not properly delegated to the MRC; that denial of benefits based on capacity to perform part-time work is proper; that Ms. Shane nevertheless *remained* eligible for LTD benefits because the record demonstrates that Ms. Shane's condition remained seriously aggravated and that she was not able to return to work on either a part-time or full-time basis when her benefits were denied.

## I. Standard of Review

### A. *Legal Standard of Review*

 The Court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan does provide for discretionary authority, "a district court may review the administrator's determinations only for an abuse of discretion." *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 (9th Cir.1993).[3] When reviewing for abuse

---

1. Although First Health is named as the contract administrator (or third party administrator) in the plan, the contract administrator at the time of Ms. Shane's disability was VPA. Hodge Decl. ¶ 4.

2. Plaintiff seeks (1) $28,727.00 in damages (calculated through 2/28/05; the sum is no longer up to date), (2) an issuance of an injunction precluding defendants from terminating her claims in the future unless there is a "substantial change" in her condition supporting her ability to perform full-time work, (3) attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1), and (4) prejudgment interest and costs. *See* PTB at 17–20.

3. The distinction between the abuse of discretion standard and the "arbitrary and capricious" standard is one without a difference.

of discretion, the court " 'review[s] only that evidence presented to the [plan] trustees.' " *Id.* (alteration partially in original and quotation omitted). Abuse of discretion may be found where an administrator's benefits determination "relies on clearly erroneous findings of fact[,] . . . ." *id.* at 1473, is unsupported by substantial evidence, *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan,* 402 F.3d 67, 74 (1st Cir.2005), or lacks a reasonable basis, *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 879 (9th Cir.2004). *See also Voight,* 28 F.Supp.2d at 576. Whether the determination was made by a fiduciary or administrator operating under a conflict of interest is weighed as a "factor in determining whether there was an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948.[4] The court must examine the specific language of a plan to determine the standard of review; "[A]n administrator ha[s] discretion only where discretion was 'unambiguously retained' by the administrator." *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999) (en banc) (quotation omitted), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999).

**B.** *The 1993 Policy Controls*

Defendants assert that the Albertson's Inc. Employees' Disability Benefits Plan, Amended and Restated Effective February 1, 2002 (the "2002 Plan"), is the controlling plan. DRB at 5 & n. 1.[5] Plaintiff

asserts that the Albertson's Inc. Employees' Disability Benefits Plan, Amended and Restated Effective August 1, 1993 (the "1993 Plan"), is the controlling plan. PRB at 3 n. 3. Plaintiff is correct.

■■■■ "When faced with questions of insurance policy interpretation under ERISA, federal courts apply federal common law. Under the federal common law of ERISA, we 'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience.' " *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1125 (9th Cir.2002), *cert. denied,* 537 U.S. 1067, 123 S.Ct. 602, 154 L.Ed.2d 556 (2002) (internal citation and quotation omitted). If a term is ambiguous it will be construed against the drafter and aligned with the reasonable expectations of the insured. *Wheeler v. Dynamic Engineering, Inc.,* 62 F.3d 634, 638 (4th Cir.1995); *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9th Cir.1994).

*1. The 1993 Plan*

The 1993 Plan provides that,

Any amendment to the Plan shall be effective only with respect to Total Disabilities which commence on and after the effective date of the amendment. *Total Disabilities commencing prior to the effective date of a Plan amendment are to be provided for under the terms of*

---

*Taft,* 9 F.3d at 1471 n. 2; *Voight v. Met. Life Ins. Co.,* 28 F.Supp.2d 569, 576 n. 3 (C.D.Cal. 1998) (Morrow, J.).

**4.** *De novo* review may be appropriate where the plaintiff can demonstrate that there has been a "serious" conflict of interest constituting a breach of fiduciary duties. *See Jordan,* 370 F.3d at 875. Plaintiff does not argue that there was a "serious" conflict of interest.

**5.** I refer to the Defendants' Rebuttal Brief as "DRB," Plaintiff's Responsive Brief as

"PRB," and the Parties' Joint Submission of Applicable Long–Term Disability Plan Documents and Administrative Record Previously Produced by Defendants as "JS." The contents of the JS are consecutively numbered by a Bates Stamp which includes the letter prefix "ALS." I refer to the contents of the JS by the applicable Bates Stamp number.

The 2002 Plan was not included in the parties' joint submission; the 1993 Plan was. JS, Ex. A. The 2002 Plan was filed by defendants on March 7, 2005. Hodge Decl., Ex. A.

*the Plan in effect at the time those disabilities commenced.*

JS, Ex. A at ALS50 (emphasis added) [hereinafter "the 1993 Plan Statement"]. The 1993 Plan provides that long-term disability benefits will be paid upon receipt of proof that a covered employee has suffered "total disability." JS, Ex. A at ALS58 (Art. III, § 3.01). The 1993 Plan defines "total disability" in two ways:

> *[Total Disability is] the complete inability of the Employee to perform any and every duty of his or her regular occupation;* provided, that if benefits have been paid pursuant to Section 3.01 for 24 months of any continuous period of Total Disability, then for the balance of the period of Total Disability following such 24–month period, *Total Disability shall mean the complete inability of the Employee to perform any and every duty of any gainful occupation for which he or she is reasonably fitted by training, education or experience,* subject to the application of Rehabilitative Employment.

*Id.* at ALS54 (Art. I) (emphasis added).

Under the 1993 Plan, the "Contract Administrator" is "First Health Strategies Inc.", or such other firm, person or corporation appointed by the Trustees [defined as "persons from time to time serving as Trustees of the Trust.] to perform the duties required . . . ." JS, Ex. A at ALS52 (Art. I). As noted above, the Contract Administrator was VPA.

The 1993 Plan provides that the Trustees,

> shall enforce the Plan in accordance with its terms, shall be charged with the general administration of the Plan, and shall have all powers necessary to accomplish

those purposes, including, but not by way of limitation to, the following:

> a. To determine all questions relating to the eligibility of Employees for benefits, as well as the amount and payment of benefits;
>
> b. To construe and otherwise interpret the Plan and Trust; . . .
>
> g. To delegate to the Contract Administrator and Employees of the Employer such powers and duties as the Trustees shall determine.

*Id.* at ALS71 (Art. IX, § 9.04). *"Whether or not Total Disability exists shall be determined by the Trustees in their sole and absolute discretion." Id.* at ALS54 (Art. I) (emphasis added).

### 2. *Plaintiff's Disability*

■ Ms. Shane, a grocery manager at Albertson's Inc.,[6] was initially injured in April 1999, when she suffered a medial meniscal tear to her left knee. She began receiving LTD benefits beginning January 31, 2000. *Id.* at ALS163. Thus, her "total disability" commenced prior to February 1, 2002, the date on which the 2002 Plan became effective.[7] She is entitled then, by the terms of the 1993 Plan, to "invoke the terms of the plan in place when her [total disability commenced] . . . ." *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1160 (9th Cir.2001). That plan is the 1993 Plan and its terms govern Ms. Shane's benefits claim.

That the 1993 Plan reserves to the Employer "the right to amend any provisions under the Plan or the Trust, in whole or in part, at any time and to any extent that it may deem advisable without the consent of any Employee[ ]" and reserves to the Em-

---

**6.** The duties of a grocery manager include "supervising and training personnel and supervising the ordering, receiving, storing, stocking, pricing and merchandising of all grocery products." JS, Ex. A at ALS64.

**7.** The 2002 Plan, by its terms, amends and restates prior plans. Hodge Decl., Ex. A at 7.

ployer "the right at any time and in its sole discretion to reduce or alter any benefits provided under the Plan, in whole or in part, or to terminate the Plan or Trust[,]" does not alter this outcome. JS, Ex. A at ALS70 (Art. VIII, §§ 8.01 & 8.03). These provisions (1) prevent an employee from claiming benefits in perpetuity should the Employer decide to terminate the plan and (2) reserve to the Employer the right to revise the terms of the plan, with such revisions applying to those whose disabilities have not yet commenced. *See, e.g., Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir.1996) ("An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits."). Sections 8.01 and 8.03 are not in conflict with the 1993 Plan Statement.

### C. *The De Novo Standard of Review Applies*

■ Although the 1993 Plan grants the Trustees the discretion to "determine all questions relating to the eligibility of [e]mployees for benefits" and to "construe and otherwise interpret the Plan and Trust," as well as the power to "delegate [powers and duties] to the Contract Administrator and Employees of the Employer[,]" that discretion could *not* properly be extended to the body-the MRC-which ultimately made Ms. Shane's benefits determinations. As such, I will review the determinations of the MRC *de novo*.

#### 1. *The 1993 Plan grants discretionary authority to the Trustees, not to the Contract Administrator or the Medical Review Committee.*

While plaintiff initially argued that the language of the 1993 Plan was insufficient to merit application of the abuse of discretion standard, in her responsive trial brief she backs away from this position, conceding that "the language contained at the end of the definition of 'Total Disability'

would probably be deemed sufficient for application of the [abuse of discretion] standard." PRB at 2. Plaintiff is correct. The 1993 Plan grants the Trustees the authority to determine eligibility, renders that determination discretionary, and gives the Trustees the authority to construe and interpret the Plan. JS at ALS54 & 71 (Art. I & Art. IX, § 9.04). *See also Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1113 (9th Cir.2001); *Bergt v. Retirement Plan For Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002) (finding grant of power and duty to interpret plan and decide questions of interpretation and eligibility sufficient to provide discretionary authority).

#### 2. *Discretionary authority was not properly delegated to either VPA or the Medical Review Committee.*

Section 1105(c)(1) of Title 29 of the United States Code (entitled "Allocation of Fiduciary Responsibility; Designated Persons to Carry Out Fiduciary Responsibilities") provides:

> The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) *for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.*

29 U.S.C. § 1105(c)(1) (emphasis added). The Ninth Circuit has held,

> where (1) the ERISA plan expressly gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan and (2) pursuant to ERISA, 29 U.S.C. § 1105(c)(1) (1988), a named fiduciary properly designates an-

other fiduciary, delegating its discretionary authority, the "arbitrary and capricious" standard of review for ERISA claims brought under § 1132(a)(1)(B) applies to the designated ERISA-fiduciary as to the named fiduciary. *Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1283–84 (1990), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991). In other words, this section "allows named fiduciaries to delegate responsibilities ... through express procedures provided in the plan. To be an effective delegation of discretionary authority so that the deferential standard of review will apply, therefore, the fiduciary must properly designate a delegate for the fiduciary's discretionary authority." *Rodriguez–Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 584 (1st Cir.1993) (citing § 1105(c)(1); *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1283–84 (9th Cir. 1990)). *See also Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Protection Plan,* 349 F.3d 1098, 1105 (9th Cir.2003) (noting that while courts give deference to the "decisions of plans in which their language grants discretionary authority, that deference applies *only* when the decision is made by the body vested with discretion." (emphasis added)).

As noted above, the 1993 Plan grants the Trustees discretionary decision-making authority and gives them the power to "delegate to the Contract Administrator and Employees of the Employer such powers and duties as the Trustees shall determine." JS, Ex. A at ALS71 (Art. IX, § 9.04(g)).[8] According to the deposition testimony of Mr. Hodge, the Director of Health and Welfare Programs at Albertson's Inc., the Trustees delegated their authority to Jack Snow, who in turn delegated his authority to the Benefit Plan Committee (also referred to as the Medical Review Committee). Hodge Decl. ¶ 2; Hodge Depo. at 119:2–5;14–25—120:1–11; Def. Stat. of Facts ¶ 34. In Mr. Hodge's words: "[Fiduciary authority] was delegated from the trustees down through Jack Snow to me, and Jack actually was the one who would have delegated the authority to the committee before I was here ...." Hodge Depo. at 119:2–5. The MRC consists of Albertson's employees and an independent physician. Hodge Decl. ¶ 3.[9]

Plaintiff argues that the MRC, or in the alternative VPA (the contract administrator), was not an "authorized" body and as such cannot be afforded the same deferential review that would be given to a body properly granted discretionary authority under the 1993 Plan. Basically, plaintiff argues that Mr. Snow did not properly delegate discretion to the MRC. The testimony of Mr. Hodge provides the only basis to find that there was any delegation of authority (from the Trustees to Mr. Snow and from him to the MRC); there is no documentation of it in the record.

In *Madden,* the plan document named the employer as plan fiduciary and administrator and authorized the employer's board of directors to appoint an administration committee to carry out the plan. *Madden,* 914 F.2d at 1284. The plan document *expressly* gave the administration committee "discretionary authority to determine eligibility for benefits and to construe the terms of the plan[.]" *Id.* The plan document *expressly* authorized the

---

8. The "Contract Administrator" is defined as "First Health Strategies, Inc., or such other firm, person or corporation appointed by the Trustees to perform the duties required *herein* to be performed by the Contract Administrator." *Id.* at ALS52 (Art. I) (emphasis added).

9. The court overrules plaintiff's objections to defendants' evidence (Bates Stamped ALS197–200, *see* Kurzon Decl. Ex. G) since it has already reviewed the materials. However, this additional material has no impact on the outcome here.

administration committee to designate another person as fiduciary for the plan's administration and, in a claims administration agreement, the employer *expressly* designated the insurance company as claims administrator and plan fiduciary, retaining ultimate discretion for itself. *Id.* The court held that the decisions of the insurance company deserved review under "the more deferential 'arbitrary and capricious' standard." *Id.* at 1285.

Here, the 1993 Plan contains no *express* delegation of authority to *any body,* save the Trustees. Neither Jack Snow, the MRC, nor VPA (the contract administrator) expressly were granted fiduciary authority or the authority to use discretion in determining claims. (In contrast, the 2002 Plan grants the Contract Administrator discretion to determine whether total disability exists and to construe and interpret the plan. Hodge Decl., Ex. A at 11 & 32.) While the Trustees did have the power to delegate their discretionary authority, nothing presented to the Court indicates that such authority was properly delegated. The deposition testimony offered by Mr. Hodge is insufficient to establish otherwise. *See Rodriguez–Abreu,* 986 F.2d at 584 (holding that because no plan document granted discretion to the plan administrator and because the fiduciaries had not expressly delegated their discretionary authority to the plan administrator, the district court properly employed the *de novo* standard of review); citing *Sanford v. Harvard Indus.,* 262 F.3d 590, 597 (6th Cir.2001) ("When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision ... deferential review is not warranted."); *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2d Cir.1995) (finding that the fiduciary must bear the burden of proof on the issue of standard of review "since the party claiming deferential review should prove the predicate that justifies it.").

Defendants admit that the MRC was the body tasked with determining whether Ms. Shane was eligible for LTD benefits. Def. Proposed Facts ¶¶ 23, 28, 34, & 35. Because the MRC was not expressly granted discretion, I find that the proper standard of review is *de novo.*

## II. The Benefits Claim

### A. *Eligibility for LTD Benefits*

The terms of the 1993 Plan require that for a claimant to qualify as totally disabled after 24 months of continuous total disability (in other words in order to qualify for "second-level" LTD benefits), claimant must possess the *"complete inability to perform any and every duty of any gainful occupation for which he or she is reasonably fitted by training, education or experience subject to the application of Rehabilitative Employment."* JS, Ex. A at ALS54 (emphasis added). The parties dispute whether the ability to perform part-time work disqualifies a claimant from being considered "totally disabled" under the 1993 Plan. The parties also dispute the precise state of Ms. Shane's disability at the time her benefits were denied.

1. *Ability to perform part-time work renders an employee ineligible for extended "Total Disability" benefits.*

In her papers, plaintiff takes the position that the termination of LTD benefits was improper because that determination was based on an "employability assessment" which found her capable of four kinds of work. Plaintiff argues that the assessment failed to take account of portions of an underlying functional capacities assessment which, according to plaintiff, showed that "Ms. Shane's physical capacities limited her performance ability to only *5 hours and 32 minutes [per day]* ...." PTB at 11 (emphasis partially added).

To support her argument regarding part-time work, plaintiff argues that the 1993 Plan's reference to "gainful occupation" *requires* that an employee receiving LTD benefits be able to work full time (an eight hour day) before she can be determined to be no longer "totally disabled." PRB at 15. According to plaintiff, this result is also supported by the fact that her employment prior to becoming disabled was on a full-time basis. PRB at 15. Defendant argues that part-time work is gainful employment and that plaintiff's ability to work for roughly five and half hours a day is sufficient to support the determination that she was no longer totally disabled. DRB at 12.

Plaintiff points to an opinion from a California Court of Appeal, *Moore v. Am. United Life Ins. Co.,* 150 Cal.App.3d 610, 617, 197 Cal.Rptr. 878 (1984). There, the plaintiff was covered by a "general disability policy" in which the term "total disability" was defined as "a disability resulting from bodily injury or disease which wholly prevented the employee 'from engaging in *any occupation or employment for compensation, profit, or gain.'"* *Moore,* 150 Cal.App.3d at 617, 197 Cal.Rptr. 878. In *Moore,* the court explained that the policy's definition of total disability was subject to the definition of that term which had been set forth by the California Supreme Court in 1942. *Id.* at 626, 197 Cal.Rptr. 878. The decision does not even mention the issue of full-time versus part-time work. It merely discussed the propriety of considering whether a disability prevents an insured from "working *with reasonable continuity* in his customary occupation or in any other occupation in which he might reasonably be expected to engage." If so, then the insured is "totally disabled." *Id.* at 630, 197 Cal.Rptr. 878 (emphasis added).

In the second case that plaintiff relies on, *Bruce v. New York Life Insurance Company,* 2003 WL 21005313 (N.D.Cal. 2003) (Chesney, J.) (unpublished), the relevant plan provided that, "a plan participant [was] initially ineligible for benefits if he [could not] perform his 'usual occupation' and thereafter only if he [could not] perform 'another occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, physical and mental capacity.'" *Bruce,* 2003 WL 21005313 at *6. The court held, upon *de novo* review, that as applied to the claimant, "another occupation" referred only to full-time work. The court based its conclusion on four grounds: (1) that the term "'occupation,' unless modified by 'part-time,' contemplates full-time work[,]" *id.* (citing Webster's II New College Dictionary 757, 1237 (1995)); (2) that "given the juxtaposition of the terms 'usual occupation' and 'another occupation,' the latter term ordinarily would be understood to mean 'another full-time occupation'[;]" (3) the plan's physical capacity forms, to be filled out by doctors, referred to the employee's ability in terms of an 8–hour workday, and (4) even if the provision was ambiguous, "ambiguous terms in policies subject to ERISA are construed against the insurance company." *Id.*[10]

---

**10.** The court also noted that its construction was consistent with law applicable to Social Security claims. *Bruce,* 2003 WL 21005313, *6 n. 12 (citing *Willis v. Callahan,* 979 F.Supp. 1299, 1305 (D.Or.1997)). *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (holding that unlike the Social Security disability program, ERISA does not require plan administrators to give special deference to the opinions of treating physicians and noting that there are "critical differences between the two programs[,]" that "[n]othing in ERISA requires employers to establish employee benefit plans[,]" and that ERISA does not "mandate what kind of benefits employers

*Bruce* is not persuasive. The court's reasoning is not grounded in case law, Ninth Circuit or otherwise, and is largely based on the analysis that "occupation," unless otherwise modified, refers to full-time work. Here, the 1993 Plan requires that claimant be incapable of performing *"any and every duty of any gainful occupation"* in order to receive extended LTD benefits. This strong language indicates that even a limited capacity, such as ability to perform some duties on a part-time basis, is a sufficient disqualifier.

 Defendants rely on the definition of "substantial gainful activity" that appears in the federal regulations governing the Social Security Administration. DRB at 13. The relevant regulation states that,

> Substantial gainful activity is work activity that is both substantial and gainful: (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
> (b) Gainful work activity. *Gainful work activity is work activity that you do for pay or profit.* Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 CFR § 404.1572 (emphasis added). As *Black and Decker, supra,* notes, the jurisprudence and regulations of the social security laws are of dubious relevance. In any event, the regulation defendants rely

on does distinguish "substantial" from "gainful." The 1993 Plan uses "gainful" to modify "occupation," but is silent on the issue of whether part-time work is preclusive and contains no provision defining part-time work.[11]

In *Ladd v. ITT Corp.,* 148 F.3d 753 (7th Cir.1998) (Posner, J.) the relevant benefit plan required that a person seeking total disability benefits be "unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which [he is] qualified, or becomes reasonably qualified by training, education, or experience." The court noted that this wording was *different* than that governing social security disability benefits, "which define[ ] disability (so far as relevant here) as an 'inability to engage in any substantial gainful activity.'" *Ladd,* 148 F.3d at 754. The court explained that under the latter, "[a]s long as the worker can engage in 'substantial gainful activity,' he is not disabled even if that work he is capable of doing is only part time." *Id.* (noting that "the work must not be so meager as not to be substantial and gainful."). Based on an admission made by the defendant's counsel that "a worker who could work ten minutes a day was [not] disentitled to total-benefits under the plan[,]" the court "proceed[ed] on the assumption that 'total disability' under the plan means ... the same thing as under the social security disability program." *Id.* Ultimately, the court held that because the claimant was entirely *incapable* of working she was "totally disabled" and entitled to benefits. *Id.* at 755–56.

---

must provide if they choose to have such a plan." (quotations omitted)).

**11.** Defendants also rely on *Smith v. Unum Life Insurance Company of America,* 305 F.3d 789 (8th Cir.2002), to support their conclusion that in the context of the 1993 Plan, ability to perform part-time work disqualifies an employee from claiming LTD benefits.

DRB at 13. *Smith* is inapposite. The plan in *Smith* provided that the administrator "would terminate benefits after twelve months of payments, upon a finding that [the employee] is 'able to work in any gainful occupation on a *part-time* basis,' but chooses not to work." *Id.* at 790. The difference in the two plans is clear.

The First Circuit has held that ability to engage in part-time work may disqualify an employee from being totally disabled where total disability is defined as "[the employee being] *completely prevented* from engaging in any occupation ....". *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184–86 (1st Cir.1998) (standard of review arbitrary and capricious). The court provided little explanation for so holding. *Id.; see also Brigham v. Sun Life of Canada*, 317 F.3d 72, 82–83 (1st Cir.2003) (same) (standard of review arbitrary and capricious). Other courts have agreed. *See, e.g., Mullaly v. First Reliance Standard Life Ins. Co.*, 253 F.Supp.2d 279, 283 (D.Conn.2003) ("In the absence of clear language permitting part-time employment, courts have uniformly declined to consider a claimant, who is capable of working part-time, eligible for benefits under a general disability policy.") (collecting cases).

▮ The 1993 Plan defines "total disability" as "the *complete inability* of the Employee to perform any and every duty of *any* gainful occupation ...." JS, Ex. A at 10 (emphasis added). In *Bond v. Cerner Corporation*, 309 F.3d 1064 (8th Cir. 2002), the court affirmed a lower court's denial of total disability payments to a plan participant because the fact that she was able to work part-time precluded her from establishing that she could not continuously perform substantial and material duties of *any* occupation and thus was not totally disabled. Similarly, I too find that under the 1993 Plan, claimants capable of performing part-time work could have their LTD benefits terminated.

B. *Ms. Shane's disability at the time her LTD benefits were terminated.*[12]

▮ Plaintiff argues that even if the ability to work part-time precluded eligibility for LTD benefits, that at the time of the benefits termination her condition had worsened. PTB at 11.

Ms. Shane suffered her initial injury on April 21, 1999, when a stack of cases fell and hit her left leg resulting in a medial meniscal tear of her left knee. (This is a tear of the knee's cartilage.) In July 1999, she underwent surgery for the injury. In November 1999, she re-injured her leg climbing a flight of stairs and underwent an additional surgery. On January 21, 2000, Albertson's informed Ms. Shane that she had been retroactively approved for the "full 13 weeks allowed under the [Albertson's] salary continuation program, through [January 30, 2000]."[13] On February 29, 2000, an Albertson's employee benefits representative notified VPA (the contract administrator) that the trustees had approved Ms. Shane for LTD benefits from January 31, 2000, through June 30, 2000 (a total of 21 weeks). From January 31, 2000 until January 30, 2002, Ms. Shane received, and was continuously re-approved for, LTD benefits.[14] There is a gap in the record as to what occurred between January 30, 2002, and April 2002, but it appears that Ms. Shane continued receiving LTD benefits. An internal VPA document entitled "Long Term Update, 2

---

12. Unless otherwise indicated, all references to the ALS refer to documents in the Joint Submission, Exhibit C.

13. It seems Ms. Shane actually received only twelve weeks of salary continuation benefits. ALS162.

14. Ms. Shane's benefits were extended as follows (as reflected in internal VPA documents): June 2000, reapproved for 18 weeks (ALS161); October 2000, reapproved for 17 weeks (ALS158); March 2001, reapproved for 26 weeks (ALS156–57) (there is a discrepancy in the record here, on May 15, 2001, Ms. Shane was notified that she had been reapproved only through September 01, 2001). (ALS148); September 2001, reapproved for 22 weeks (ALS146).

Year Recertification" that is dated April 2, 2002, establishes that Ms. Shane was approved for LTD benefits to be paid past the initial LTD benefits 24–month mark through July 31, 2002 (26 weeks, effective February 1, 2002). ALS144. Thus, at this point in April 2002, Ms. Shane was considered to be totally disabled under the 1993 Plan's more stringent definition (*i.e.*, completely unable to participate in any gainful occupation for which she was reasonably fitted). At the time of her 24–month recertification, Ms. Shane suffered from lumbar disc disease and from the continuing effects of the damage and surgery to her left knee. ALS144. The internal VPA document from April 2002 also contains the following notation: "Please request update from *both* physicians." ALS144 (emphasis in original).

On or around July 17, 2002, Ms. Shane's physician, Dr. Citek, submitted an attending physician's statement ("APS") indicating that Ms. Shane had been and continued to be totally disabled (unable to work), that her condition was "unchanged", and that she would be able to return to work "with limitations" in January 2003 (six months later). ALS 143. The APS further indicates that Ms. Shane had a "class 3" physical impairment ("[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity ([level of] 35–55%)") and a "class 2" mental/nervous impairment ("[a]ble to function in most stress situations and engage in most interpersonal relations (slight limitations)"). Finally, the doctor notes that Ms. Shane "needs to change positions between standing, sitting, [and] walking frequently." Based on this APS, continuation of

LTD benefits was ordered denied. ALS 141(internal document dated July 23, 2002). On August 12, 2002, Ms. Shane was notified of the denial. ALS139. Ms. Shane appealed, and on or about August 26, 2002, her LTD benefits were reinstated and approved through March 31, 2003. ALS 137 (an "MD" letter—in all probability a doctor's note—seems to have prompted reversal of this initial benefit's denial, but the letter is not in the record, *see* ALS137). The internal document approving benefits also indicates that for further extension of LTD benefits, a functional capacities assessment ("FCA") would be required. ALS137.

On March 20, 2003, Dr. Citek signed an APS indicating that Ms. Shane would be able to return to work on December 31, 2003 (eight months later) but could not presently return to work "with her limitations." ALS 132. Dr. Citek indicated that she would have "class 3" physical impairment "when recovered" and that she had "class 2" mental/nervous impairment. In the remarks section he indicated that Ms. Shane needs "frequent change of position[,]" "rest breaks[,]" and that she would "likely not be able to work over 4 hours [per] day." ALS 132. In an attached physician's statement, Dr. Citek indicated that Ms. Shane continued to suffer from degenerative disc disease, depression, and left knee injury. ALS133.[15] The doctor classified Ms. Shane as capable of sedentary work, but added (in his own script) that this would be true only when she "recovered from current therapy" and stated that she was capable of working no more than four hours per day. ALS134. Ms. Shane's benefits were approved only through April 20, 2003 (an additional month) and the VPA requested that Ms. Shane undergo a FCA.[16] ALS119–124.

**15.** The parties agree that the document appearing at ALS133 was submitted with the APS dated March 20, 2003. Defendant argues that on this statement, Dr. Citek indicated that Ms. Shane would be able to return to work on "3–20–03." ALS133. Looking at

the form, it is reasonable to infer that Dr. Citek meant to indicate the date he was signing the form rather than the date Ms. Shane would be able to return to work.

**16.** The FCA states that it is a "nationally recognized standardized test which assists in

Indeed, in May 2003, Ms. Shane went through a FCA. The FCA and a job history (completed by Ms. Shane) were referred to Corvel Corporation for an "employability assessment." ALS116. The resulting employability assessment letter, considered by the VPA, makes only general reference to the FCA and its findings although it attached the FCA itself. ALS117. On July 29, 2003, based on "the Transferable Skills Analysis" (ostensibly the employability assessment), Ms. Shane was notified that her benefits were cut-off. ALS 113. On an internal VPA "Long Term Update: Over 2 Years" dated July 15, 2003, there is the following notation: "Please Deny. She is capable of performing sedentary duties and there are 4 jobs identified .... She no longer is totally disabled as defined by the Plan." ALS115.

Ms. Shane twice appealed the termination of her benefits. In a letter written in support of the second appeal, dated September 10, 2003, Dr. Citek stated that Ms. Shane suffers from chronic pain, lumbar disc disease, and knee pain associated with her two surgeries. ALS95. He opined that her pain prevented her from performing "normal work duties" and sitting and standing for more than 30 minutes at a stretch. He noted that she required "significant amount[s] of pain medication" and that she suffered "from depression." Finally, he concluded that she was "temporarily totally disabled" and "unable to be gainfully employed anywhere at this time, and for the foreseeable future." *Id.*

In an APS report dated August 29, 2003, Dr. Citek indicated that Ms. Shane had been instructed to stay off work only until November 2003 and that "[s]he is making progress in her physical therapy program

and weight loss program." ALS97. On September 23, 2003, the VPA notified Ms. Shane that her appeal had been denied. (An internal update document dated September 16, 2003, states "Please uphold denial. Medical information submitted is not enough to overturn previous denial." ALS94.)

Performing this review *de novo,* I find that the employability assessment and the initial letter denying benefits lack support in the record. The FCA contains a table arranged in a two-column format. The header of the first column is "activity." The header of the second column is "client maximum ability." ALS122. Participants are rated along the following standards based on an eight-hour workday: "seldom" equals less than 1%; "occasional" equals 1%–33%; "frequent" equals 34%–66%; and "continuous" equals 67% to 100%. ALS122. The information in Ms. Shane's FCA table reflects that this grocery manager could *"never"* squat, repetitively bend, climb stairs, or crawl; she could "seldom" rotate or extend her neck; she could "seldom" stand, and then for only up to five minutes; and she could only "occasionally" twist, walk, and operate foot controls. ALS123.

The VPA terminated Ms. Shane's LTD benefits because the Corvel assessment found that she could perform four other jobs. The record does not explain or support how, with her debilitating conditions (conditions that *are* reflected both in the FCA *and* in her doctors' reports), Ms. Shane could perform those other jobs. The denial of benefits was not determined on a sufficient basis. In addition, Ms. Shane's doctors' reports consistently recommended that Ms. Shane *not* to return to

the determination of return-to-work status. The [FCA] objectively measures physical and functional abilities, and can provide safe limits for work activities such as lifting, bending,

or carrying .... The FCA also provides objective data to establish the employee's physical and functional level prior to vocational rehabilitation ...." ALS119.

work on even a part-time basis. *See, e.g.,* JS, Ex. C at ALS132–34, ALS101, ALS99, 97.

In summary, there was no basis for the finding that given her substantial limitations, Ms. Shane was able to return to work on even a part-time basis.

### III. Conclusion

For the foregoing reasons, plaintiff was entitled to continue receiving LTD benefits. Plaintiff shall submit a proposed judgment in light of this opinion.

IT IS SO ORDERED.[17]