Diane S. **FORTUNE**, Plaintiff,

v.

**GROUP LONG TERM DISABILITY PLAN FOR EMPLOYEES OF KEYS- PAN CORPORATION, Hartford Life Insurance Company, Oxford Health Plans, Metropolitan Life Insurance Company, Defendants.**

**No. 08–CV–1017 (ADS)(ETB).**

United States District Court, E.D. New York.

July 25, 2009.

The ERISA Law Group, by Thornton L. Davidson, Esq., Of Counsel, Fresno, CA, for Plaintiff.

Sedgwick, Detert, Moran & Arnold LLP, by Michael H. Bernstein, Esq., John Thomas Seybert, Esq., Of Counsel, New York, NY, for Defendants Group Long Term Disability Plan for Employees of Keyspan Corporation and Hartford Life Insurance Company.

No Appearances, Oxford Health Plans and Metropolitan Life Insurance Company.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Diane Fortune ("Fortune" or "the Plaintiff") brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., alleging that she was wrongfully denied disability benefits by Hartford Life Insurance Company ("Hartford") under the terms of a long-term disability plan funded by her former employer, Keyspan Corporation. Hartford has filed a counterclaim to recover an overpayment arising out of a retroactive award of benefits to Fortune by the Commissioner of Social Security. Presently before the Court is Hartford's motion for summary judgment.

## I. BACKGROUND

Fortune worked as an attorney for Keyspan from 1993 until February 1, 2004. During her tenure at Keyspan, she was a participant in the Group Long Term Disability Plan for Employees of Keyspan Corporation ("the Plan"), an employee welfare benefit plan regulated under ERISA. The Plan was insured by Hartford, and Hartford administered all claims for benefits under the Plan.

### A. The Plan

The Plan provides that, to be eligible for long-term disability benefits, a participant must be unable to perform one or more of the essential job duties of the participant's "own occupation." Under the terms of the Plan, after a 24 month period, in order to remain eligible for long-term disability benefits, a participant must show that her disability prevents her from performing one or more of the essential duties of "any occupation." The phrase "any occupation" is defined in the Plan to mean an occupation for which the participant is "qualified by education, training, or experience," that also meets a certain earnings threshold.

The Plan also includes a provision that entitled Hartford to recover any overpayments made to a participant that should have been offset by a participant's receipt of "Other Income Benefits," such as social security disability income ("SSDI") payments. The Plan grants Hartford complete discretion and authority to interpret the terms of the Plan and to determine a participant's eligibility for benefits.

### B. Fortune's Claim for Long–Term Disability Benefits

Fortune was diagnosed with multiple sclerosis in late 2003. Due to complica-

tions from her condition, she stopped working at Keyspan on January 30, 2004. On May 4, 2004, Fortune submitted a claim to Hartford for long-term disability benefits under the Plan. Fortune's application noted that her multiple sclerosis was disabling in that she suffered from fatigue, cognitive memory impairment, and loss of balance.

Fortune's application identified neurologists Dr. Ira Turner ("Dr. Turner") and Dr. Brian R. Apatoff ("Dr. Apatoff") as her treating physicians. According to medical records received by Hartford, Fortune visited Dr. Apatoff only once in May of 2003. Dr. Apatoff noted her cognitive complaints and indicated that Fortune's clinical history was consistent with demyelinating disease.

Fortune began visiting Dr. Turner on a regular basis in late 2003. According to Dr. Turner's notes, Fortune saw him five times between January 15, 2004 and April 29, 2004. Prior to Fortune's office visit on April 29, 2004, Dr. Turner submitted an Attending Physician's Statement which noted that Fortune complained of fatigue, bladder issues, cognitive memory impairment, and loss of balance. His statement also noted that her condition had "retrogressed." According to a physical capacity evaluation Dr. Turner conducted in July of 2004, he determined that Fortune could sit for three hours at a time and was capable of standing, walking, or driving for up to one hour. Tests performed by Dr. Turner in also revealed that Fortune could lift, carry or pull up to ten pounds and occasionally climb, kneel, or crawl.

On June 1, 2004, Hartford conducted an Occupational Analysis of Fortune's position. The Occupational Analysis identified her position as sedentary, requiring her to occasionally lift, carry, push, or pull 10 pounds. On or about July 19, 2004, Hartford determined that the medical informa-

tion submitted by Fortune supported the finding that she was unable to perform the essential duties of her job. Accordingly, on July 22, 2004, Hartford approved Fortune's claim for long-term disability benefits.

On June 2, 2005, Fortune provided Hartford with a copy of a Notice of Disapproved Claim from the Social Security Administration ("SSA"), dated March 14, 2005 and the SSA's Explanation Determination, dated March 8, 2005. The Explanation Determination noted that Fortune's claim for social security disability benefits was being denied because her condition was not so severe as to keep her from working. In particular, the SSA found that, based upon the medical evidence, Fortune's age, levels of education and experience, she was able to perform a job that would involve less stress than her former position.

By letter dated November 10, 2005, Hartford requested information from Fortune to prove that she remained disabled within the meaning of the Plan. The letter noted that, as of May 1, 2006, in order to remain eligible for long-term disability benefits, Fortune would have to meet the "any occupation" standard set forth in the Plan. In response to Hartford's request for medical information, Dr. Turner provided his notes from Fortune's office visits on June 30 and October 7, 2005. Dr. Turner also submitted an Attending Physician's Statement of Continued Disability in connection with an office visit on January 5, 2006. In this report, Dr. Turner noted that Fortune's condition had improved. The report also noted that Fortune was not taking any prescribed medications to alleviate symptoms related to her multiple sclerosis.

On March 14, 2006, on behalf of Hartford, R.N. Barbara A. McClurkin reviewed the medical records submitted by For-

tune's treating physicians. Following her review, she found that the medical information did not support a finding that Fortune was unable to work in a sedentary occupation. In particular, McClurkin noted that Fortune suffered from no functional limitations other than intermittent weakness. Fortune also noted that Dr. Turner's report indicated her condition had improved. Following McClurkin's review of the medical records, Hartford sent Fortune a letter indicating that it was continuing its review of her claim and that benefits would be extended to May 1, 2006 while the review was pending.

On April 14, 2006, Hartford referred reports from Dr. Turner, Dr. Apatoff, and Fortune's internist Dr. Chetan Sati, as well as laboratory, radiology and Somatosensory Evoked Potential reports to Dr. William Sniger for his review. In a report dated May 2, 2006, Dr. Sniger found that "the preponderance of the objective information does not appear to support the severity of the claimant's subjective symptoms or alleged inability to perform full-time work." Dr. Sniger, who is Board-certified in Physical Medicine and Rehabilitation and Spinal Cord Injury Medicine, noted that Fortune could walk, stand, and lift or carry ten pounds occasionally. He also found that Fortune was not restricted from using a keyboard or other functions requiring repetitive use of her hands.

In light of the restrictions noted by Dr. Sniger, Hartford also commissioned an employability market analysis to determine what occupations, if any, would be suitable for Fortune. In a report dated June 5, 2006, Rehabilitation Case Manager, Angela Baird, determined that there were eleven legal and/or accounting positions available to Fortune based upon her experience and educational training. Jacqueline C. Siver, a Hartford claims examiner, reviewed Fortune's medical records,

McClurkin's findings, Dr. Sniger's report and Baird's employability analysis.

In a report dated June 6, 2006, Siver recommended that Fortune's continuing long-term disability benefits be terminated. The matter was subsequently referred to a separate Hartford examiner, Adriana Kolb, who agreed with Siver's recommendation. In particular, Kolb noted that Fortune was no longer disabled within the meaning of the Plan under either the "own occupation" or "any occupation" standard. By letter dated June 9, 2006, Siver notified Fortune of Hartford's decision to deny her claim.

On July 5, 2006, Fortune challenged Hartford's decision, contending that: (i) Dr. Sniger failed to contact Dr. Turner; (ii) the letter denying her claim failed to address her constant fatigue; and (iii) Dr. Sniger was not qualified to review Fortune's "neurological" file. Fortune also submitted a letter from Dr. Sati, dated July 14, 2005. In the letter, Dr. Sati concluded that, in light of her condition, Fortune was unable to work in any gainful occupation. By faxed correspondence dated July 11, 2006, Hartford wrote to Dr. Turner and requested that he offer his opinion on Dr. Sniger's report. In response to a prepared summary of Dr. Sniger's report, Dr. Turner noted that Dr. Sniger's conclusions "seem[ed] reasonable."

On July 18, 2006, Siver reviewed Dr. Sati's letter and Dr. Turner's response to Dr. Sniger's report and concluded that the additional evidence did not warrant a change in her initial determination that Fortune was no longer entitled to long-term disability benefits. That same day, Nancy Sawyer, Siver's supervisor, reviewed the additional information and concluded that the medical evidence did not support Fortune's claim that she was disabled from working in "any occupation."

On July 20, 2006, Dr. Turner faxed a letter and office notes concerning Fortune's office visit on the previous day. Based upon his examination during this office visit, Dr. Turner concluded that Fortune was suffering from recently exacerbated symptoms associated with her multiple sclerosis. By letter dated March 16, 2007, Fortune appealed Hartford's decision to deny her continuing long-term disability benefits.

## C. Fortune's Administrative Appeal

In her appeal letter, Fortune argued that Hartford's interpretation of Dr. Turner's response to Dr. Sniger's report was incorrect and that Dr. Turner should have been given an opportunity to supplement his response. Fortune also noted in her letter that the SSA had reversed its earlier decision and found her to be disabled within the meaning of the Social Security Act. However, notwithstanding Hartford's request for a copy of the SSA decision, Fortune did not include it as part of her administrative appeal.

In connection with her appeal, Fortune submitted: (i) a letter from Dr. Turner, dated April 25, 2005; (ii) a Multiple Sclerosis Impairments Questionnaire completed by Dr. Turner, dated June 28, 2005; (iii) a narrative report from Dr. Turner detailing his treatment of Fortune, dated June 29, 2005; (iv) a Vocational Assessment conducted by Amy Peiser Leopold, a disability management consultant; (v) a Multiple Sclerosis Impairments Questionnaire completed by neurologist Dr. Vincent F. Macaluso, dated December 18, 2006; (vi) a note from Dr. Macaluso's office, dated November 16, 2006; (vii) a brain MRI report, dated November 22, 2006; (viii) an Adult Organicity Evaluation report completed by licensed psychologist Dr. Judith Shaw, dated February 17, 2005; (ix) a report completed by Dr. Apatoff describing the re-sults of a neurological consultation, dated May 12, 2003; and (x) treatment records forwarded by Dr. Sati.

Dr. Turner's Multiple Sclerosis Impairments Questionnaire noted that Fortune suffered from fatigue, weakness and impairment of manual dexterity, numbness, and increased muscle tension. Dr. Turner's narrative report summarized his treatment of Fortune and concluded that she was, at that time, unable to be gainfully employed in any capacity. Amy Peiser Leopold conducted a Vocational Assessment of Fortune, finding that Fortune was unable to "engage in any substantial or gainful work" due to her condition. Leopold compared the duties of the alternative occupations listed in Baird's employability analysis with Fortune's former responsibilities as a tax attorney and concluded that because "Fortune is unable to complete her own occupation as Legal Counsel, it is unreasonable to expect her to perform a similar job function that is as physically demanding . . ."

On November 16, 2006, Fortune visited Dr. Macaluso. In connection with this visit, Dr. Macaluso completed a Multiple Sclerosis Impairments Questionnaire. Dr. Macaluso noted that Fortune suffered from, among other things, certain cognitive and motor impairments and constant fatigue. He also noted that Fortune was only capable of sitting for up to four hours per day, walking less than one hour per day, and occasionally lifting or carrying up to five pounds.

The administrative record also included a brain MRI report that was performed on November 22, 2006. The MRI report showed "findings compatible with chronic demyelinating disease," with "non enhancing white matter lesions" in both hemispheres. Fortune also submitted an Adult Organicity Evaluation prepared by Dr. Judith Shaw. Dr. Shaw did not review any

medical records but noted Fortune's subjective complaints about short-term memory loss, distractability, and problems with her concentration. Dr. Shaw offered a "guarded" prognosis of Fortune's condition, finding that the multiple sclerosis appeared to impact her cognitive functioning. Fortune's appeal also included a report from Dr. Apatoff describing the results of a neurological consultation. Although Dr. Apatoff noted that her May 2002 MRI was consistent with a diagnosis of multiple sclerosis, he found that, as of May 2003, she had "normal mental status and language."

Laurie Tubbs, an Appeal Specialist with Hartford, handled Fortune's appeal. After receiving and reviewing the claims file, the appeal letter, and the additional submissions provided by Fortune, Tubbs obtained two additional medical record reviews from neuropsychologist, Dr. Milton Jay, and neurologist Dr. Randall King. Dr. Jay and Dr. King were referred to Hartford by University Disability Consortium ("UDC"), a company that provides doctors for medical evaluations and disability consultations.

Dr. Jay criticized the reliability and completeness of Dr. Shaw's Adult Organicity Test. With respect to the completeness of Dr. Shaw's review, Dr. Jay found that "the scope of the evaluation was not consistent with the usual expectations of a comprehensive neuropsychological evaluation of formal impairment determination quality." Dr. Jay noted that the report did not indicate what medical records were reviewed in connection with the evaluation and also noted that Dr. Shaw appeared to rely exclusively on Fortune's self-reported medical history. In sum, Dr. Jay concluded that "the overall scope and quality of the examination was not adequate ... to demonstrate adequately reliable and valid indications of cognitive inefficiency to preclude [Fortune's] functional capacity to consistently work on a full-time basis."

Dr. King reviewed the pertinent medical and neuropsychological records and also discussed Fortune's condition with Dr. Turner and Dr. Macaluso. In his conversations with Dr. King, Dr. Turner indicated that although he did not believe that Fortune was capable of working as a lawyer, he was uncertain as to whether she was suited to working in a less stressful occupation. Dr. Macaluso stated to Dr. King that he did not believe Fortune was capable of working in even a sedentary occupation because of the seriousness of her cognitive complaints.

After reviewing the pertinent medical records, Dr. King concluded that Fortune had benign multiple sclerosis and that her cognitive complaints were unsupported by the objective evidence. Dr. King found that Fortune's Expanded Disability Status Score ("EDSS") range of 2.0 to 2.5 was such that she would have "very minimal functional limitation" and that she would "almost certainly be capable of working at either [a] light or sedentary level."

On May 15, 2007, Tubbs reviewed the medical reports submitted by Dr. Jay and Dr. King. That same day, Tubbs notified Fortune by letter of Hartford's decision to uphold the denial of Fortune's claim for continuing long-term disability benefits. Tubbs explained that after reviewing all of the records, Hartford determined that there was "no evidence of cognitive insufficiency." Tubbs noted that "from a physical perspective, [Hartford] finds that [Fortune] maintains the capacity to perform full time sedentary to light level work."

Tubbs also addressed the SSA's finding that Fortune was disabled within the meaning of the Social Security Act. As Tubbs explained:

> You report in your appeal letter that Ms. Fortune has been found disabled by

the [SSA]. We assume your position ... in providing this information is that you believe receipt of these benefits provides additional corroboration of her claims for disability. However, as claims administrator, [Hartford] retains the right to investigate and administer benefits in accordance with the terms of the applicable policy and to render a decision independent of the decisions of government agencies, employers and other providers of insurance. Therefore, in rendering a decision in this claim we did not consider the [SSA's] decision as corroboration of your eligibility benefits under this Policy.

## D. The Social Security Disability Income Payments

While her administrative appeal with Hartford was pending, the Social Security Administration informed the Plaintiff on or about September 11, 2006 that she was eligible to receive retroactive SSDI benefits in the amount of $1,804 per month dating back to July of 2004. In light of the Plaintiff's disability, her children were also awarded SSDI benefits in the amount of $902 per month as of July 2004. By letters dated June 4, 2007 and August 1, 2007, Hartford requested that the Plaintiff provide documentation with regard to the Social Security award so that Hartford could calculate whether it was entitled to repayment under the offset provision in the Plan. Although the Plaintiff did not respond to these requests, in November of 2007 Hartford advised her that, in light of the retroactive SSDI payments, they believed she had received $63,108.43 in overpaid benefits under the Plan.

The Plaintiff did not respond to Hartford's request for restitution of the alleged overpayments. However, on March 11, 2008, the Plaintiff commenced this lawsuit against the Plan and Hartford among oth-

ers, seeking a declaratory judgment that Hartford is required to pay her long-term disability benefits until she reaches the age of 65 or is determined to be ineligible for benefits under the Plan. The Defendants filed an answer to the complaint on May 27, 2008, asserting a counterclaim that they were entitled to offset the Plaintiff's monthly long-term disability payments by the amount of SSDI payments made to her *and* her dependent child.

In July of 2008, the Plaintiff sought leave to amend her complaint to assert a claim on behalf of herself and a proposed class of plaintiffs who alleged that Hartford improperly offset their monthly long-term disability benefits by the amount of SSDI payments their dependent children received. The Defendants argued that the proposed amended claim was futile because the Plan clearly permits Hartford to make such an offset. The Court agreed. In an Order dated November 29, 2008, the Court found that "[t]he Plan plainly allows Hartford to offset the Plaintiff's benefits and those of any other similarly situated beneficiary by the amount in SSDI payments a beneficiary's dependent children receive as a result of their parents' disabilities ..." *Fortune v. Group Long Term Disability Plan for Employees of Keyspan Corp., et al.,* 588 F.Supp.2d 339, 342 (E.D.N.Y.2008).

## II. DISCUSSION

### A. Legal Standard

### 1. Summary Judgment Standard

It is well-settled that summary judgment is proper only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden of showing the absence of any genuine dispute as to a material facts rests with the party seeking summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, there is no genuine triable issue where a party fails to offer proof concerning an essential element of her case. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

"Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA." *See Alfano v. CIGNA Life Ins. Co. of New York,* No. 07 Civ. 9661, 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009) (collecting cases). "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.' " *Id.* (quoting *Ludwig v. NYNEX Service Co.,* 838 F.Supp. 769, 780 (S.D.N.Y.1993)).

### 2. ERISA Standard

■ Section 502(a)(1)(B) of ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008) (citing 29 U.S.C. 1132(a)(1)(B)). The Supreme Court has explained that where the plan "grants the administrator discretionary authority to determine eligibility benefits, a deferential standard of review is appropriate." *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 132 (2d Cir. 2008) (citing *Glenn,* 128 S.Ct. at 2348). "Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Id.* (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir. 1995)). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.' " *Celardo v. GNY Auto. Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003) (quoting *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995)).

■ In reviewing a claim under Section 502(a)(1)(B), "the court should consider only the evidence in the administrative record unless good cause for considering additional evidence is shown." *Alfano,* 2009 WL 222351, at *13 (citing *Connors v. Connecticut Gen. Life Ins. Co.,* 272 F.3d 127, 134–35 (2d Cir.2001), and *DeFelice v. Am. Int'l Life Ass. Co. of New York,* 112 F.3d 61, 66–67 (2d Cir.1997)). The Court's review of the administrative record "must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." *Rappa v. Connecticut General Life Ins. Co.,* No. 06 Civ. 2285, 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (quoting *Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.,* 862 F.Supp. 783 (E.D.N.Y.1994)).

### B. Hartford's Motion for Summary Judgment

■ There is no dispute that the Plan grants Hartford the discretionary authority to interpret the terms of the Plan and to determine a claimant's eligibility for benefits. Nevertheless, Fortune claims that

Hartford abused its discretion in several ways. Principally, Fortune contends that the evidence relied upon by Hartford was insufficient to support the finding that she was not disabled within the meaning of the Plan. The Court disagrees.

In filing the administrative appeal, Fortune carried the burden to demonstrate that she was disabled within the meaning of the Plan. Hartford determined that she failed to meet that burden because she could not demonstrate that her multiple sclerosis left her unable to perform the essential functions of any occupation for which she was "qualified by education, training, or experience." The Court's review of the administrative record reveals that this determination is supported by substantial evidence.

This is not to say that Fortune's claim was without support in the administrative record. Dr. Turner's Multiple Sclerosis Impairments Questionnaire noted that Fortune suffered from fatigue, weakness and impairment of manual dexterity, and increased muscle tension. In his narrative report of her treatment, Dr. Turner found that, as of June 2005, Fortune was unable to be gainfully employed in any capacity. Dr. Macaluso concurred with Dr. Turner's opinion, finding that Fortune was only capable of sitting for up to four hours per day and walking less than one hour per day. Dr. Sati, Fortune's internist, also believed that she was incapable of even sedentary work.

Dr. Shaw noted Fortune's subjective complaints about short-term memory loss, distractability, and problems with her concentration. Ultimately, Dr. Shaw offered a guarded prognosis of Fortune's condition and found that multiple sclerosis appeared to impact her cognitive functioning. Leopold conducted a Vocational Assessment of Fortune and found that she was unable to "engage in any substantial or gainful work" due to her condition. Leopold also criticized Baird's employability analysis stating that because "Fortune is unable to complete her own occupation as Legal Counsel, it is unreasonable to expect her to perform a similar job function that is as physically demanding . . ."

The problem with Fortune's well-documented claim is that there was also credible medical evidence which indicated that she was not disabled. Although the Court credits the findings of Dr. Turner, Dr. Macaluso, and Dr. Sati, unlike the Court's review in the context of a SSA decision, Hartford was not required to "to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Nor will the Court impose on Hartford "a discrete burden" to explain why the company has credited "reliable evidence that conflicts with a treating physician's evaluation." *Id.; see also Zoller v. INA Life Ins. Co. of New York,* 06 Civ. 112, 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008) (observing that there is no "treating physician rule" in the context of an ERISA claim). It suffices that there was plausible medical evidence in the record that a reasonable mind could accept as adequate to support the conclusion reached by Hartford. *See Suren v. Metropolitan Life Ins. Co.,* No. 07 Civ. 4439, 2008 WL 4104461, at *4 (E.D.N.Y. Aug. 29, 2008) (quoting *Rosario v. Local 32B–32J,* 00 Civ. 7557, 2001 WL 930234, at *4 (S.D.N.Y. Aug. 16, 2001)) (observing that "the mere existence of conflicting evidence does not render [an administrator's] decision arbitrary or capricious.").

Here, Dr. Sniger's review of the medical records submitted by Dr. Turner, Dr. Apatoff and Dr. Sati led him to conclude that "the preponderance of the objective information" did not support "the severity of

[Fortune's] subjective symptoms or alleged inability to perform full-time work." It is noteworthy that, in response to a prepared summary of Dr. Sniger's report, Dr. Turner indicated that Dr. Sniger's conclusions "seemed reasonable." R.N. McClurkin reviewed the medical records submitted by Fortune's treating physicians and also concluded that records did not support a finding that Fortune was unable to work in a sedentary occupation. In particular, McClurkin noted that Fortune suffered from no objective functional limitations other than intermittent weakness. In May of 2003, Dr. Apatoff found that Fortune had "normal mental status and language" abilities. After conducting an employability analysis, Baird determined that, contrary to Fortune's claims, there were eleven suitable occupations available to Fortune based upon her experience and educational training, including various legal and accounting positions.

Dr. Jay found fault with Dr. Shaw's findings, concluding that the "overall scope and quality of the examination was not adequate ... to demonstrate adequately reliable and valid indications of cognitive insufficiency to preclude [Fortune's] functional capacity to consistently work on a full-time basis." After reviewing the medical records submitted by Fortune, Dr. King concluded that she was suffering from benign multiple sclerosis and that her cognitive complaints were unsupported by objective evidence. In particular, Dr. King found that Fortune's EDSS score range of 2.0 to 2.5 was such that she would have "very minimal functional limitation" and that she would "almost certainly be capable of working at either [a] light of or sedentary level." In addition, the Court notes that in discussing Fortune's condition with Dr. King, Dr. Turner indicated that although he did not believe that Fortune was capable of working as a lawyer, he was not certain about whether she could work in a less stressful position.

The Court recognizes that Dr. Jay and Dr. King were referred to Hartford by UDC and that UDC may derive a considerable percentage of its revenue from Hartford. The Court also appreciates that, because of this relationship with Hartford, doctors referred by UDC may have some financial incentive to deny a participant's claim for long-term disability benefits. Nevertheless, Fortune offers the Court no convincing medical reason—apart from their alleged conflict—why their medical opinions should be disregarded or even de-valued. Thus, although the findings of Dr. Jay and Dr. King were viewed with an appropriately skeptical eye, the Court is satisfied that their medical opinions were well supported.

Fortune claims that Hartford failed to give reasonable consideration to her subjective complaints of fatigue. However, her argument is belied by the administrative record. Both Dr. Sniger and Dr. King noted Fortune's subjective complaints of fatigue and found them to be inconsistent with the objective medical evidence. Indeed, even Dr. Turner conceded that Fortune's complaints of fatigue were unsupported by any objective evidence. Several courts in the Eastern and Southern District of New York have found that it is not arbitrary for an administrator to require a claimant to offer objective medical evidence of their disabilities in order to be eligible for benefits. *See Suren,* 2008 WL 4104461, at *11 (collecting cases). In this case, Hartford did not abuse its discretion by failing to credit Fortune's subjective and unsubstantiated complaints of disabling fatigue.

Fortune offers two additional reasons why she believes there are triable issues concerning whether Hartford's decision was supported by substantial evidence.

First, she claims that Hartford's determination is unreliable because, in evaluating Fortune's claim, the company was operating under a conflict of interest. In particular, Fortune argues that Hartford's claim examination process is tainted by a structural conflict of interest in that the company has both the discretionary authority to evaluate and pay benefit claims under the Plan. Second, Fortune contends that Hartford failed to give adequate consideration to the SSA's finding that she was disabled within the meaning of the Social Security Act. The Court will address each of these arguments in turn.

### 1. Hartford's Alleged Conflict of Interest

 After *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion ..." *McCauley*, 551 F.3d at 133 (citing *Glenn*, 128 S.Ct. at 2348). The weight assigned to the alleged conflict will differ "according to the evidence presented." *Id.* However, the existence of a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* (quoting *Glenn*, 128 S.Ct. at 2351).

 Here, the Court is satisfied that Hartford has taken active steps to cure any structural conflict of interest. Hartford has effectively "walled-off" claims examiners from the company's finance department by ensuring that an examiner's compensation is not determined by reference to his or her record in denying claims. Hartford has also created a check against the arbitrary denial of claims and sought to promote accuracy by maintaining a separate appeal unit that independently considers claims that were denied upon initial review. *See Glenn*, 128 S.Ct. at 2351 (noting that an administrator can cure a potential conflict of interest "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."). Accordingly, in this case, the alleged structural conflict of interest carries no weight in the Court's review of Hartford's determination.

### 2. The SSA's Decision

 Fortune argues that Hartford failed to give adequate consideration to the SSA's finding that she was disabled within the meaning of the Social Security Act. It is true that a SSA decision granting disability benefits should be considered as "one piece of evidence" in support of a claim. *Alfano*, 2009 WL 222351, at *17 (quoting *Billinger v. Bell Atlantic*, 240 F.Supp.2d 274, 285 (S.D.N.Y.2003)) (observing that SSA decisions should be considered in part because the SSA "is an objective governmental body that undertakes a thorough review of applicants' eligibility for benefits, and has neither the incentive to disperse benefits liberally, nor a reputation for overindulging applicants."). However, although a favorable determination by the SSA certainly supports a disability claim, it is not controlling where the administrator's decision to deny benefits is otherwise supported by substantial evidence. *Badawy v. First Reliance Standard Life Ins. Co.*, 581 F.Supp.2d 594, 605 (S.D.N.Y.2008) (finding that the administrator did not abuse its discretion in denying a claim for benefits because, notwithstanding the plaintiff's favorable SSA decision, the administrator's

determination was supported by substantial evidence); *Suren,* 2008 WL 4104461, at *10 (same); *Compare Alfano,* 2009 WL 222351 (finding that the administrator's denial of the participant's claim was arbitrary and capricious where, in addition to favorable finding from the SSA, the claimant's six treating physicians found that he was disabled).

 Here, it is difficult to discern what weight, if any, Hartford assigned to the SSA's favorable decision. In her letter denying Fortune's administrative appeal, Tubbs merely states that she did not find the SSA's decision as "corroborative" of Fortune's claim for benefits. Ideally, Hartford should have explained, in greater detail, why it reached a different conclusion concerning Fortune's functional capacities. Nevertheless, Hartford's failure to do so does not, in this case, counsel in favor of finding that Hartford abused its discretion. In light of the medical evidence contained in the administrative record, the Court is satisfied that Hartford's determination was supported by substantial evidence.

## C. Hartford's Counterclaim

 "ERISA protects the administrator's right to obtain equitable relief to enforce the terms of the Plan." *See Suren,* 2008 WL 4104461, at *12 (citing 29 U.S.C. § 1132(a)(3)). Here, the Plan provides that any long-term disability benefits payable under the Plan must be offset by "Other Income Benefits," including social security disability payments that a participant receives. On August 4, 2004, Fortune signed a Reimbursement Agreement that required her to repay any overpayments in a lump sum.

Hartford paid long-term disability benefits to Fortune between May 1, 2004 and June 5, 2006 in the amount of $3,832.49 per month. On or about March 16, 2007, For-

tune informed Hartford that she had received a retroactive payment of SSDI for the period from July 1, 2004 to June 5, 2006. Hartford determined that Fortune received SSDI payments in the amount of $1,804 per month and that her dependent children received an additional $902 per month from the SSA.

Fortune concedes that, in light of the retroactive award from the SSA, she received $63,108.43 in overpayments from Hartford. Fortune also does not dispute that the Plan permits Hartford to offset her long-term disability benefits by the amount in SSDI benefits *she* received. However, Fortune argues that the Plan does not give Hartford the authority to offset her benefits by the amount in SSDI payments her dependent children received.

The Plan defines "Other Income Benefits" as "any benefit for loss of income, provided to you or your family, or to a third party on your behalf as a result of the period of Disability for which you are claiming benefits under this plan." The "benefit" referred to in the Plan includes SSDI benefits and any benefits under a "similar act or plan that the [beneficiary], *[the beneficiary's spouse] and children* are eligible to receive because of [the beneficiary's Disability . . .]" (emphasis added). The Plan also provides that Hartford has the right to recover "any amount that is an overpayment of benefits under [the] plan." Overpayments are defined in the Plan to include "retroactive awards of Other Income Benefits."

As noted in the Court's November 29, 2008 Order, the "plain, clear and unambiguous import of [the Plan's relevant provisions] is that Hartford is permitted to offset Fortune's long-term disability benefits by the amount in SSDI benefits she and her dependent children receive because of her disability." *Fortune,* 588

F.Supp.2d at 341. The Court also observed that the "Second Circuit has upheld the general enforceability of such provisions in *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1198–99 (2d Cir.1989)," and that several district courts have countenanced similar or identical provisions. *See Fortune*, 588 F.Supp.2d at 341–42 (collecting cases). Fortune offers the Court no convincing reason to reconsider its interpretation of the Plan. Accordingly, Hartford is entitled to summary judgments on its counterclaim.

Fortune claims that she is entitled to reduce the overpayment by $5,300; the amount she allegedly incurred in attorneys' fees while seeking an award from the SSA. Hartford concedes that the Plan permits such an offset. However, Hartford notes that Fortune has failed to offer any documentary proof of the amount expended. Under the circumstances, the Court finds it appropriate to afford Fortune ten days from the date of this Order to provide Hartford and the Court with documentation of her legal expenses.

### III. CONCLUSION

Based on the foregoing, Hartford's motion for summary judgment dismissing the complaint is granted. Hartford's motion for summary judgment on its counterclaim is also granted. However, the Plaintiff has ten days from the date of this Order to provide documentation of the amount in attorneys' fees that she incurred in connection with her pursuit of SSDI. Once the Plaintiff provides with the Court with the relevant documentation, the Court will enter an appropriate Order resolving Hartford's counterclaim.

**SO ORDERED.**