**Frank ALBERIGO, Plaintiff,**

v.

**The HARTFORD, Defendant.**

**No. 10 CV 4735 (NG)(JO).**

United States District Court,
E.D. New York.

Sept. 14, 2012.

Louis R. Burko, Severance, Burko & Spalter, P.C., Brooklyn, NY, for Plaintiff.

Matthew Paul Mazzola, Michael H. Bernstein, Sedgwick LLP, New York, NY, for Defendant.

## OPINION AND ORDER

NINA GERSHON, District Judge:

Frank Alberigo brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, alleging that he was wrongfully denied disability benefits by The Hartford Life Insurance Company ("Hartford") under the terms of a long-term disability plan established by his former employer, LaBranche

& Co Inc. ("LaBranche"). Presently before the court is Hartford's motion for summary judgment.

## FACTS

Mr. Alberigo worked as a "new accounts clerk" at LaBranche for eight and a half years, from 1997 through May 31, 2006. Mr. Alberigo was a participant in the LaBranche Group Long Term Disability Plan (the "Plan"), which is governed by ERISA. Hartford issued a group policy of insurance to fund benefits under the Plan and also administered all claims for benefits under the Plan, pursuant to a full grant of administrative authority.

Mr. Alberigo has suffered from various heart problems since 1993. In 1993, at the age of 45, Mr. Alberigo experienced congestive heart failure and underwent surgery for a heart valve replacement, excision of an aneurysm in his ascending aorta, and insertion of a dacron graft. Following the operation, Mr. Alberigo returned to his employment, which, at that time, was operating his family grocery store.

### A. The Plan

The Plan provides that, to be eligible for long-term disability benefits, a participant must be unable to perform one or more of the essential job duties of the participant's "own occupation." Under the terms of the Plan, after a 24 month period, in order to remain eligible for long-term disability benefits, a participant must show that his disability prevents him from performing one or more of the essential duties of "any occupation." A plan participant is considered totally disabled under the "any occupation" definition if he is unable to perform any occupation for which he is "qualified by education, training, or experience" and is not gainfully employed, meaning he has not secured employment that would enable him to earn more than 80% of his monthly earnings. (Declaration of David J. Zych, Ex. A, 15).[1]

### B. Mr. Alberigo's Claim for Short-Term Disability Benefits

Mr. Alberigo stopped working at LaBranche on May 31, 2006 because symptoms from his thoracic aneurysm and aortic valve disorder necessitated an aortic root replacement surgery. On June 26, 2006, LaBranche faxed a completed "Notice and Proof of Claim for Disability Benefits" to Hartford's Short Term Disability Unit. On July 6, 2006, Hartford approved plaintiff's claim for short-term disability benefits through June 13, 2006, but requested updated medical records to determine his ongoing eligibility for short-term disability benefits. On July 12, 2006, Dr. Kloth, Mr. Alberigo's cardiologist, completed an Attending Physician's Statement ("APS") in support of Mr. Alberigo's claim. In his APS, Dr. Kloth listed a primary diagnosis of "thoracic aneurysm, aorta" with a secondary diagnosis of aortic valve disorder.

Mr. Alberigo has been under Dr. Kloth's care since September 2, 1998. In the APS, Dr. Kloth noted that Mr. Alberigo was scheduled for open heart surgery on September 6, 2006 to repair his aortic graft because his aneurysms were "expanding." In the APS, Dr. Kloth restricted Mr. Alberigo from performing any strenuous activity or lifting heavy objects. On July 24, 2006, after reviewing Dr. Kloth's APS, Hartford approved Mr. Alberigo's claim for continuing STD benefits though July 12, 2006 and requested that he continue to provide updated medical rec-

---

1. All page number citations refer to Bates Stamped pages annexed as Exhibits A & B to the Declaration of Daniel J. Zych, which constitute the record in this case.

ords to support his continued claim. Dr. Kloth completed an additional APS dated July 24, 2006 in which he included physical examination findings, noted that Mr. Alberigo had undergone a 64–slice helical CT angiogram on May 25, 2006, but did not discuss the test results, and noted that Mr. Alberigo had been referred to Dr. Galloway, a cardiovascular surgeon, for open heart surgery. In the July 24 APS, Dr. Kloth indicated that Mr. Alberigo had no restrictions or limitations on his ability to stand, walk, sit, reach in any direction, drive, or use the keyboard. Dr. Kloth did reiterate that Mr. Alberigo could not lift or carry heavy objects and could not push or pull objects.

Dr. Kloth also submitted a copy of the May 25 CT angiogram and CT chest scan. The tests were accompanied by a radiology report describing that the scans showed "significant dilation of the aortic sinuses," "mild to moderate coronary artery disease" of the left anterior descending coronary artery, and "mild coronary artery disease" of the left circumflex artery and right coronary artery. The radiologist also observed that Mr. Alberigo had a myocardial bridge in the mid and distal left anterior descending coronary artery, and dilated left ventricle size with "moderate systolic dysfunction." (419–420). The record also contains a letter dated May 31, 2006, from Dr. Galloway to Dr. Kloth, in which, in addition to describing Mr. Alberigo's past medical history, including details of his heart surgery in 1993, she indicated that the tests showed progressive aneurismal dilation of the aortic root. She opined that the May 25 CT angiogram confirmed that the aortic root was dilated to above 6 cm, measuring between 6 and 6.5 cm in various areas. Dr. Galloway indicated that the area involved included "all the sinuses of the Valsalva distally to 1 to 2 cm beyond the sinotubular junction, where the previous graft is visualized." (421). Finally, Dr.

Galloway recommended that Mr. Alberigo "proceed with operation for aortic root replacement." (421).

When speaking with a Hartford claim examiner, Caitlin Brennan, on August 4, 2006, Dr. Kloth explained that, Mr. Alberigo could not make up his mind whether or not to have the surgery. Mr. Alberigo wanted to delay his surgery until November because "he did not know if he [would] make it through another [surgery]." (382). Dr. Kloth also explained that, despite having severe left ventricular dysfunction, a mechanical heart valve, and major heart disease, Mr. Alberigo returned to work in 1993. Dr. Kloth opined that returning to work after the surgery in 1993 was a mistake and that Mr. Alberigo should never have returned to work.

On August 4, 2006, Hartford determined that Mr. Alberigo's medical records supported an extension of STD benefits through the date of exhaustion, September 22, 2006, and forwarded his file to the LTD claims unit.

## C. Initial Grant of Long Term Disability Benefits

As part of his claim for long term disability benefits, on September 14, 2006, Mr. Alberigo completed a "Long Term Disability Income Benefits Questionnaire," which elicited basic information regarding Mr. Alberigo's salary and employment history. Mr. Alberigo worked for 17 years as a grocer, for one year as a toll collector, and for eight and a half years as a new accounts clerk at LaBranche. He reported that his duties at LaBranche involved opening retail and institutional accounts on the computer, filing papers, and updating account files. On this questionnaire, he indicated that he could perform all of the basic activities of daily life without assistance. On September 19, 2006, Rocco De-

maria, a Hartford claim examiner, entered the following notes regarding the questionnaire: "Received IBQ from [Mr. Alberigo] who advised his job is basically sitting all day and inputting into the computer plus some filing, etc." (109). Mr. Demaria then called LaBranche to discuss Mr. Alberigo's claim. Mr. Demaria's notes from that conversation read: "[Mr. Alberigo's] job was basically sitting all day with heavy phone and computer usage plus some standing, walking, bending, etc. for filing. Lifting involved light files weighing anywhere from 1 to 10 lbs. at most." (109).

On September 20, 2006, as the final step in the long term disability claim process, Mr. Demaria conducted a claimant interview with Mr. Alberigo. With regard to Mr. Alberigo's medical condition and treatment, Mr. Demaria noted the following:

[Mr. Alberigo] advised that in 1993 he had a faulty valve replaced and when correcting this found an aneurysm that was repaired. He was basically okay until this spring when he developed [congestive heart failure], has a very low ejection [fraction] of 30, his heart is weak and another aneurysm has been discovered that needs operated on [sic] but he is fearful and hesitant to. have this done as he just lost a brother that had complications from a simple hernia operation. He also has [shortness of breath] after walking about a block and says his heart is weak. He sees Dr. Kloth this Friday as he is monitoring his condition thru MRI's, CT Scans, etc. His treatment at present is to avoid anything stressful or physical. His medications are Coreg, Digoxin, Coumadin and Vasolec.

(108). With regard to functionality, Mr. Demaria understood that Mr. Alberigo was able to "take care of himself," that he spent his day reading, visiting with friends on the phone, doing small chores around the house and resting frequently throughout the day. (108). Once again Mr. Alberigo reiterated that "his job was basically sitting with heavy phone and computer usage plus [ ] some filing and lifting under 10 lbs." (108). Mr. Alberigo also disclosed to Mr. Demaria that "even with surgery, he [was] not sure if he would be able to [return to work] as until the surgery is done they won't know if his [ejection fraction] will improve." (108).

On September 20, 2006, Hartford notified Mr. Alberigo that his claim for LTD benefits was approved. The letter explained that:

Benefits payments will continue, subject to the terms and limitations of the policy, while you meet the policy definition of Total Disability. During the Elimination Period and for the next 24 months, Total Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that you are:

1. Continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and

2. Not Gainfully Employed."

As of August 29, 2008, Total Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

1. Continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and

2. Not Gainfully Employed.

In no event, however, will benefits be payable beyond 07/01/2012. (395).

The letter went on to explain that under the terms of the Plan, Mr. Alberigo was entitled to the assistance of legal advisors. "[Y]our LTD benefits provide you with access to the services of professional counselors, as well as financial and legal advis-

ors. Through our Ability Assist program, these services include unlimited toll-free telephone access to a helpline available 24 hours a day, up to five face-to-face counseling sessions or equivalent professional time, referrals to support services and resources, and interactive web services." (396).

Some time prior to January 2007, Hartford referred an attorney to Mr. Alberigo to assist him with his Social Security Disability claim, but Mr. Alberigo had already retained his own attorney.

On September 5, 2007, during a phone interview with Hartford, the plaintiff advised Hartford that he had been awarded Social Security Disability benefits. Under the terms of a contract entitled "LTD Options and Reimbursement Agreement," Mr. Alberigo opted to receive his full long-term disability benefit from Hartford with no reduction for estimated Social Security benefits. He agreed to provide a lump sum repayment to Hartford in the event that he received Social Security benefits, which, under the terms of the Plan, are considered a source of income that may be deducted from Hartford's LTD payment. Mr. Alberigo also signed two consents entitled "Social Security Administration Consent Authorization for Release of Earnings Information" and "Social Security Administration Consent Authorization for Release of Information." Both consents contain the language: "I want this information released to document my Long Term Disability claim and/or to determine the benefits payable under the provisions of the policy under which I am insured." These forms enabled Hartford to access a "Summary Earnings Query" to learn of any earnings received by Mr. Alberigo and a "Full Account Query" which gave Hartford full access to extensive private information including "all personal and benefit information regarding myself and family members who applied for Social Security benefits on my record" and "eligibility and entitlement to benefits on this or any other record." (357).

On September 15, 2007, Hartford sent Mr. Alberigo a letter requesting $12,280.00 in reimbursement, which Hartford calculated to be the overpayment amount for the tax years 2006 and 2007. The letter explained that, under the terms of Mr. Alberigo's LTD policy, Hartford was entitled to reimbursement for the amount of federal disability assistance Mr. Alberigo received from November 1, 2006, the date he was deemed to be entitled to Social Security Disability benefits. By October 5, 2007, Mr. Alberigo had settled the "overpayment balance."

During this period of time, at Hartford's request, Dr. Kloth provided two updates with regard to Mr. Alberigo's medical condition. On a form dated December 5, 2006, entitled "Attending Physician's Statement of Continued Disability," Dr. Kloth noted that Mr. Alberigo was prohibited from engaging in heavy lifting or strenuous activity and checked that Mr. Alberigo was not able to return to work, either without or with restrictions. On a form dated April 12, 2007, entitled "Attending Physician's Statement of Functionality," Dr. Kloth indicated that there had been "no change in physical assessment" and that Mr. Alberigo was to engage in "no heavy lifting." Dr. Kloth did not, however, provide the requested information regarding specific functional restrictions or limitations. Dr. Kloth also indicated that it was not appropriate for Mr. Alberigo to engage in any "vocational rehabilitation" including worksite accommodations, alternative work, or retraining assistance. With regard to the question, "If 'No' anticipated date they can participate" Dr. Kloth wrote "N/A," meaning that the question of retraining for alternate employment was not applicable to

Mr. Alberigo. (364). The administrative record reflects that Hartford requested that Dr. Kloth provide his office notes from January 1, 2007 to the present; however, those notes were never submitted to Hartford.

On April 20, 2007, at Hartford's request, Mr. Alberigo submitted an "Activities of Daily Living Questionnaire." On the questionnaire, Mr. Alberigo reported that he did not have any trouble accomplishing the mundane tasks of daily life such as bathing, using the bathroom, dressing, eating, moving to and from bed, or walking from one room to another in his home. He did report that at least one of the drugs he was taking required that he have a blood test every three weeks for the rest of his life and that his doctor had instructed him to lose weight, avoid stress, and avoid lifting anything over ten pounds. He noted that his most significant physical limitation was that he would become short of breath while walking and that, when this occurred, he had to wait three to four minutes before continuing to walk. Mr. Alberigo indicated that he had obtained a high school education, but did not attend college. He reported that his doctor had advised him that he should not return to work in the future, including "some other kind of work" than he performed as a new accounts clerk at LaBranche.

Hartford conducted periodic "milestone calls" with Mr. Alberigo to interview him regarding his medical condition. On the December 12, 2007 call, Mr. Alberigo informed Hartford that he recently visited the emergency room because he was had a frozen shoulder and was unable to walk. Mr. Alberigo began treatment with a rheumatologist, Dr. Goddard, on December 13, 2007, who diagnosed Mr. Alberigo with polymyalgia rheumatica, spondylotic disease of the spine, and osteoarthritis of the hands, knees, and feet. Dr. Goddard's medical evaluation found that Mr. Alberigo had a decreased range of motion in his left shoulder, restricted range of motion in the cervical and lumbar spine, and mild restriction with internal and external rotation of both hips.

Hartford continued to pay Mr. Alberigo's disability benefits through the full 24 months of the "your regular occupation" phase.

### D. Denial of Continued Long Term Disability Benefits

On March 7, 2008, Ms. Santeler, a claim examiner at Hartford, notified Mr. Alberigo by mail that her office would conduct an investigation to determine if he would qualify for benefits under the "any occupation" standard.

On March 8, 2008, Dr. Kloth completed a Physical Capacities Evaluation form for Mr. Alberigo. The first question asks the physician to indicate how many hours at a time and how many hours total that a patient is able to sit, stand, and walk in a workplace environment. Dr. Kloth left that section blank. In section two, Dr. Kloth indicated that Mr. Alberigo could occasionally lift up to 20 pounds, but never more than 20 pounds. He also indicated that Mr. Alberigo could frequently drive, balance, utilize fine motor skills, and feel textures and temperatures with his hands. He also recorded that Mr. Alberigo could occasionally stoop, kneel, crouch, reach, and hold things, but that he could never climb or crawl. With regard to whether these restrictions were temporary Dr. Kloth wrote: "[patient] has received permanent disability." (301).

On March 11, 2008, Dr. Kloth responded to a questionnaire, the purpose of which was to assess Mr. Alberigo's "current level of functionality so we may more appropriately assess his return to work options." (326). On this form, Dr. Kloth wrote:

"The above has applied for and been granted permanent N.Y. State disability. He has had no change in status since forms last filled out. [Diagnosis] Thoracic Aortic Aneurysm, [congestive heart failure], [aortic valve replacement]. There has been no change in his medications." (326). Then, Dr. Kloth checked that Mr. Alberigo was able to perform sedentary work on a full time basis.

With regard to the receipt of the questionnaire, Nurse Barbara T. Phelps, a Hartford employee, made the following notation: "There has been no change in [Mr. Alberigo's] condition per [attending physician]. [Mr. Alberigo] has arotic [sic] aneurysm and congestive heart failure with symptoms of fatigue. By self report, [Mr. Alberigo] has limited function. There are no medical records indicating actual medical findings either related to cardiac condition or polymyalgia which [Mr. Alberigo] reports. Although cardiologist has checked sedentary work there does not seem to be any basis for this. [Mr. Alberigo] has no change in status per [attending physician]." (92).

On March 28, 2008, Ms. Santeler conducted a phone interview with Mr. Alberigo. With regard to Mr. Alberigo's functionality she noted that he "displayed difficulty and [shortness of breath] during interview. [Mr. Alberigo] indicates that he can perform [daily life activities] independently. [He] states that he has to pace himself and daily functions take him time to complete." (90).

On August 8, 2008, Hartford received Mr. Alberigo's medical file from Dr. Goddard which contained Dr. Goddard's notes from eight office visits between the dates of December 13, 2007 and June 26, 2008, and the results of blood work ordered by Dr. Goddard. Dr. Goddard's notes from June 26, 2008 indicate that Mr. Alberigo had a 10% reduction in range of motion in his left shoulder, osteoarthritis in four joints of his hands, restricted range of motion of the cervical spine, restricted range of motion of the lumbar spine, mild restriction with internal and external rotation of both hips, osteoarthritis of both knees, and osteoarthritis of the small joints of the feet. Dr. Goddard's notes reflect that by June 26, 2008, Mr. Alberigo's polymyalgia rheumatica (which caused stiffness in his left shoulder and hips) was improved, but the notes do not reflect a change in Mr. Alberigo's other rheumatic conditions.

On August 26, 2008, Hartford generated an Employment Analysis Report (EAR) which utilized the functional capabilities outlined by Dr. Kloth. According to the report, although Mr. Alberigo is disabled from being a new accounts clerk, he is able to perform four other jobs: customer-complaint clerk, dispatcher, referral clerk, and surveillance-system monitor.

On August 27, 2008, Hartford mailed Mr. Alberigo a letter informing him that he did not meet the definition of being disabled to perform "any occupation." The letter explained to Mr. Alberigo that "[b]enefits were initially approved based on the medical information which supported your heart condition would preclude you from performing your regular occupation as a New Accounts Clerk. This is because your insured occupation required prolonged standing and walking." (222).

### E. Mr. Alberigo's Administrative Appeal

On October 27, 2008, Mr. Alberigo, through his attorney Louis Burko, Esq., submitted a letter of appeal to Hartford. Mr. Alberigo's claim file was transferred to Dan Zych, Appeal Specialist. A letter sent to Mr. Burko indicated that Hartford would make a decision within 45 days, but

if special circumstances prevented Hartford from making an appeal decision in that time, the evaluation period would be extended to 90 days.

As part of Mr. Alberigo's appeal, he submitted a letter from Dr. Goddard dated September 11, 2008. The letter reads:

> This patient is presently under my care. He has polymyalgia rheumatica that is moderately active and severe polyarticular osteoarthritis affecting his hands, shoulders, hips and knees. He has spondylotic disease of the spine. He is limited in upper and lower extremity function. He cannot bend lift, stoop or carry any object heavier than 5 pounds. He has severe heart disease. He has undergone repair of heart valve and aortic aneurysm. He is medically totally disabled and unable to undertake any work. This disability is permanent. Please contact this office if further information is required.

(211). Dr. Goddard's stationary, used for this letter, indicates that he is a Fellow of the American College of Physicians, a Fellow of the American College of Rheumatology, and a Professor of Clinical Medicine at SUNY Health Science Center. The record also shows that Dr. Goddard is a Clinical Professor of Medicine at Weill College of Medicine, Cornell University.

On November 19, 2008, Mr. Zych referred Mr. Alberigo's claim to a medical record peer review vendor, University Disability Consortium ("UDC"). UDC retained Dr. Onwubueke, who is board certified in internal medicine, to review Mr. Alberigo's medical records. On December 9, 2008, Hartford notified Mr. Burko that Mr. Alberigo's file had been forwarded to an independent physician for review. Hartford informed Mr. Burko that, because the file was forwarded for review, Hartford would use the additional 45 day period allowed under ERISA to complete its review.

As part of the review, Dr. Onwubueke called Dr. Kloth on December 9, 2008. Dr. Onwubueke's report provides the only record of the conversation. His report reads:

> In our conversation, Dr. Kloth made the following points. He stated that Mr. Alberigo certainly could sit at a desk. He stated that he was not bedridden. He is ambulatory. Dr. Kloth stated that he did not know if his previous job involved sitting at a desk or not. He also stated that he had undergone an extensive cardiac surgery in the past. He stated that the problem is that he went back to work after undergoing that surgery and he probably should have been permanently disabled at that time. He notes that when Mr. Alberigo was faced again with the decision of undergoing another major heart surgery, he decided that he would rather pursue a less active lifestyle rather than take the risk. He sought permanent disability and he has received this from the state. Dr. Kloth stated that he probably should not have gone back to work after his initial cardiac surgery, as this raises the question as to why he cannot work at this time. He notes that he has severe left ventricular dysfunction with ejection fraction ranging in the 20–25% range on echocardiograms done in his office. Dr. Kloth stressed again that he did receive permanent disability from the state.[ . . . ] I noted that I had reviewed forms signed by Dr. Kloth in the past in which he indicated that Mr. Alberigo was able to perform sedentary-type work. I again reviewed the fact that sedentary work entails sitting for about six hours out of an eight-hour work day and requirement for brief periods of standing and walking on an occasional basis. Dr. Kloth agreed that he was capable of this level of work as he had previously stated.

(172). Dr. Onwubueke did not speak with Dr. Goddard. On three occasions, Dr. Onwubueke called at times when Dr. Goddard was either unavailable or out of the office. On December 11, 2008, Dr. Goddard's office manager returned Dr. Onwubueke's call and informed him that Dr. Goddard would require a signed release from Mr. Alberigo prior to speaking to Dr. Onwubueke. As a result, Dr. Onwubueke did not speak with Dr. Goddard prior to completing his file review. After reviewing the paperwork in the file,[2] Dr. Onwubueke concluded that Mr. Alberigo was capable of performing sedentary work on a full time basis.

Mr. Zych corresponded with Mr. Alberigo's attorney, Mr. Burko, to obtain an authorization from Mr. Alberigo allowing Dr. Onwubueke to communicate with Dr. Goddard. Mr. Zych's initial attempt to get the authorization through Mr. Burko, on January 6, 2009, was unsuccessful so he followed-up on February 3, 2009. Mr. Zych received the authorization on February 8, 2009.

On February 13, 2009, Dr. Onwubueke attempted to follow-up with Dr. Goddard so that he could provide Hartford with an addendum to his report. According to Dr. Onwubueke's report to Hartford, Dr. Goddard stated that he did not recall receiving any documentation regarding Dr. Onwubueke's call, but that "even if he did, he will absolutely not discuss the case on the telephone stating that he is not allowed to by HIPAA.[3] I asked if he will discuss the case if he had a signed authorization with my name specifically written on it. He stated that he would not since he would not be able to verify my identity on the phone. He stated that he does not discuss these cases on the phone. He will provide written documentation if requested stating that his office will make appropriate charges." (155). Hartford did not follow-up with Dr. Goddard in writing. On February 13, 2009, Hartford mailed a notification to Mr. Alberigo's attorney informing him that Mr. Alberigo's appeal was denied.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment Standard

Summary judgment is appropriate where the "movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ "Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA," *see Alfano v. CIGNA Life Ins. Co. of New York*, No. 07 Civ. 9661, 2009 WL 222351, at *12

---

**2.** Dr. Onwubueke notes that no office notes from Dr. Kloth were provided for review.

**3.** The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C.A. § 1320, *et seq.*, contains a "privacy rule" which requires written patient authorization prior to the disclosure of confidential health information. *Id.* at 42 U.S.C. §§ 1320d–1320d–9.

(S.D.N.Y. Jan. 30, 2009) (collecting cases), and, as the parties recognize, on the application for summary judgment by one party, the court has the authority to render summary judgment for the nonmoving party. *Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir.1970). "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'" *Id.* (*quoting Ludwig v. NYNEX Service Co.,* 838 F.Supp. 769, 780 (S.D.N.Y.1993)).

### B. ERISA Standard

■ According to principles of trust law, a benefit determination is a fiduciary act, and courts must review *de novo* a denial of plan benefits unless the plan provides to the contrary. *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 132 (2d Cir.2008) (*citing Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 111, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)). Thus, when an ERISA plan grants discretion to a plan administrator, federal courts review its decisions regarding plan benefits under the "arbitrary and capricious" standard. *See, e.g., Garcia Ramos v. 1199 Health Care Employees Pension Fund,* 413 F.3d 234, 237 (2d Cir.2005). Denials of benefits "may be overturned as arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2d Cir.2002) (internal quotation marks and citations omitted). "Substantial evidence ... is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] ... requires more than a scintilla but less than a preponderance" of evidence. *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995) (internal citations and quotation marks omitted). In evaluating the decision to deny benefits, the court must consider only evidence contained in the administrative record. *Miller,* 72 F.3d at 1071. "If upon review a district court concludes that the [administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" *Id.; Zuckerbrod v. Phoenix Mut. Life Ins. Co.,* 78 F.3d 46, 51 n. 4 (2d Cir.1996) (remand would be a useless formality "where the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record was unreasonable").

## II. The Denial of Benefits

Several factors support the conclusion that Hartford's decision to deny Mr. Alberigo benefits was arbitrary and capricious and unreasonable.

### A. Conflict of Interest

■ When the entity that administers an ERISA plan, such as an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket, the Supreme Court has held "that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 108, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

■ "A *Glenn* analysis proceeds in two steps. The initial inquiry is simple: whether the plan administrator both evaluates claims for benefits and pays benefits

claims. If so, the court goes on to determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk ..." *Durakovic v. Building Service 32 BJ Pension Fund,* 609 F.3d 133, 138 (2d Cir. 2010).

Because Hartford is both the plan administrator and the insurance company paying out benefits, it has an inherent conflict of interest.

 The weight properly accorded a *Glenn* conflict varies in direct proportion to the "likelihood that [the conflict] affected the benefits decision":

> The conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn,* 554 U.S. at 117, 128 S.Ct. 2343 (citation omitted). Evidence that a conflict affected a decision may be categorical (such as "a history of biased claims administration") or case specific (such as an administrator's deceptive or unreasonable conduct). *Id.* at 117–119, 128 S.Ct. 2343; *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 138 (2d Cir.2008). In this case, both parties have cited cases finding that Hartford either has a history of biased claims administration or, that, be-

cause Hartford has taken steps to reduce potential bias, the conflict is unimportant. *Compare Peterson v. Hartford Life and Acc. Ins. Co.,* No. 2:11–cv–10932, 2011 WL 6000776 (E.D.Mich. Nov. 30, 2011), *with Fortune v. Group Long Term Disability Plan for Employees of Keyspan Corp.,* 637 F.Supp.2d 132 (E.D.N.Y.2009). However, I need not examine whether there was a categorical conflict since the case specific conflict here is so apparent.

In *Glenn,* for example, the Court suggested that the conflict could have been given more weight because MetLife took "seemingly inconsistent positions [that] were both financially advantageous: MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so ... and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." *Id.* at 118, 128 S.Ct. 2343. The Court recognized that evidence like this not only demonstrated that the decision making process was procedurally unreasonable but also justified giving more weight to the conflict.

 Turning to this case, the record reflects (and Hartford's attorney acknowledged at oral argument) that Hartford engaged in a more "robust" review when more money was at stake, *i.e.,* when considering the LTD decision under the "your own occupation" definition as opposed to the "any occupation" definition. Trans. of June 5, 2012, 11:17.

In addition, Hartford's explanation of its decision was deceptive. In the August 28, 2008 letter informing Mr. Alberigo that Hartford would not continue to pay LTD benefits under the "any occupation" standard, Hartford explained that "[b]enefits were initially approved based on the medical information which supported your

heart condition would preclude you from performing you regular occupation as a New Accounts Clerk. *This is because your insured occupation required prolonged standing and walking.*" (222). This explanation is plainly false. At the time the initial benefits determination was made, notations in the record reflect that Hartford understood that Mr. Alberigo's job involved "basically sitting with heavy phone and computer usage plus did some filing and lifting under 10 lbs." (393).

Also, as will be demonstrated in more detail, Hartford credited one contradictory statement by Dr. Kloth, where he stated that Mr. Alberigo was capable of performing sedentary work, in contradiction to all previous statements by Dr. Kloth, and essentially ignored, without good reason, the report of Dr. Goddard that concluded that Mr. Alberigo was disabled from performing any occupation. "This kind of wholesale embrace of one medical report supporting a claim denial to the detriment of a contrary report that favors granting benefits was determined in *Glenn* to be indicative of an administrator's abuse of discretion." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d at 136–137 (internal citation omitted); *see also Levitian v. Sun Life and Health Ins. Co.*, 2012 WL 2299302, *3 (2d Cir.2012).

Finally, as will be discussed in more detail *infra*, as in *Glenn*, Hartford failed to consider that Mr. Alberigo was granted Social Security Disability benefits. Hartford not only failed to explain its reasoning for differing in its decision from the Social Security Administration's ("SSA") finding, it failed to take the determination into consideration at all. This complete disre-

gard for the SSA's determination further supports that Hartford's decision making process was compromised by its conflict of interest.

The reasoning used by Hartford to deny Mr. Alberigo benefits was not rational and at times was simply false. Those factors coupled with Hartford's use of a higher standard of review for the "any occupation" phase of the LTD decision than it did in making the "your own occupation" LTD benefits decision leads to the conclusion that Hartford's conflict of interest significantly affected its decision.

**B. Vocational Capacity Determination is Arbitrary and Capricious**

▮ The record reflects unequivocally that there was no improvement in Mr. Alberigo's medical condition from the time he was determined to be disabled under the "your own occupation" standard and the time that he was determined to be able to perform sedentary level work under the "any occupation" standard. The only change in his condition was negative; he developed rheumatism and arthritis and his congestive heart failure worsened.[4] At the time of the initial long-term benefits determination, plaintiff was awaiting open-heart surgery for his heart condition. He then decided not to have surgery because he was afraid to take the risk.[5] However, his heart condition did not improve in that time.

Further, the record shows that, when Hartford found that Mr. Alberigo could not perform his "own occupation" as a new accounts clerk at LaBranche, it was well understood by Hartford that his position there was sedentary. There are multiple

---

4. Dr. Kloth reported to Hartford in December 2008 that Mr. Alberigo's ejection fraction was between 20–25% as compared to 38% in 2006 when the "your own occupation" LTD decision was made.

5. Hartford did not deny benefits on this ground.

instances in the record that support the finding that, when Hartford determined that Mr. Alberigo was incapable of performing his own occupation, there was no ambiguity that that occupation involved "basically sitting all day with heavy phone and computer usage plus some standing, walking, bending, etc. for filing."

Hartford relies heavily on Dr. Kloth's assessment that Mr. Alberigo could do sedentary work. However, Dr. Kloth repeatedly stated that Mr. Alberigo was permanently disabled, should not engage in strenuous activity, that his medical condition had not changed, and that Mr. Alberigo should have not have returned to work in 1993 after his open-heart surgery. Therefore, any reasonable person reviewing the record would conclude that, when Dr. Kloth checked that Mr. Alberigo was capable of performing sedentary work on a full-time basis, that was an anomalous statement requiring explanation and clarification. In fact, since there had been no change in Mr. Alberigo's medical condition, Nurse Phelps noted that there was no medical basis for Dr. Kloth's statement that Mr. Alberigo could perform sedentary work. Hartford followed-up on this contradiction when Dr. Onwubueke and Dr. Kloth spoke. In that call, Dr. Kloth reiterated that Mr. Alberigo is disabled. However, according to Dr. Onwubueke's notes, Dr. Kloth also confirmed his opinion that he felt Mr. Alberigo was capable of sitting at a desk for six to eight hours a day. This conversation, as documented only by Dr. Onwubueke, does nothing to lend clarity to the inherent contradictions in Dr. Kloth's representation on the March 11 questionnaire. As a result, Hartford's determination relies not on medical evidence, but solely on one statement by Dr. Kloth that is inherently contradictory. The reviewers at Hartford simply relied on a single piece of information that weighed in favor of discontinuing benefits and discounted other information that weighed in favor of granting benefits.

After determining that Mr. Alberigo could do sedentary work, Hartford concluded that there were four sedentary jobs that Mr. Alberigo could perform. These jobs were customer-complaint clerk, dispatcher, referral clerk, and surveillance-system monitor. Only one of the occupations, as a customer-complaint clerk, was considered a "good" match; the other three were considered only "fair" matches, meaning that Mr. Alberigo would have to receive vocational training to obtain them. Three of the four jobs involved talking on the phone. The record reflects that Mr. Alberigo had difficulty speaking on the phone and demonstrated shortness of breath on multiple brief phone conversations with Hartford interviewers. It is simply irrational to conclude that a man who becomes short of breath during phone conversations can secure employment that largely entails speaking on the phone. Even more remarkably, the occupations proposed by the EAR report entail a level of exertion similar to that required of Mr. Alberigo's position at LaBranche, which Hartford had concluded Mr. Alberigo was unable to perform. Hartford has not demonstrated that Mr. Alberigo's position as new accounts clerk was not sedentary. In fact, the EAR report assumed that Mr. Alberigo could lift up to 20 pounds, while Hartford considered him disabled from his own occupation which entailed lifting files weighing no more than 10 pounds. Thus, the EAR report used physical capabilities that exceeded the reported physical exertion required by Mr. Alberigo's own occupation. In sum, the conclusion that Mr. Alberigo could not perform the duties of a new accounts clerk but could perform the duties of a customer complaint clerk, a dispatcher, or a referral clerk, is without reason.

Moreover, the EAR that Hartford relied on in making its determination was performed in August of 2008, prior to the appeal, and was based only on Mr. Alberigo's functional capabilities as reported by Dr. Kloth, Mr. Alberigo's cardiologist and did not include the findings of Dr. Goddard, Mr. Alberigo's rheumatologist. Dr. Goddard was treating Mr. Alberigo for multiple rheumatoid conditions and had made medical findings regarding Mr. Alberigo's functionality including that he had a 10% reduction in the range of motion of his left shoulder, osteoarthritis in four joints of his hands, restricted range of motion of his cervical spine, and restricted range of motion of his lumbar spine. Even after the appeal, when Dr. Goddard supplied the medical opinion that Mr. Alberigo's cardiac condition, coupled with his rheumatoid conditions, rendered him totally disabled, the EAR was never revised to include Mr. Alberigo's rheumatoid conditions.

For these reasons, the conclusion that Mr. Alberigo was capable of performing work under the "any occupation" standard was arbitrary and capricious.

## C. Irrational Disregard for Dr. Goddard's Medical Determination

■ Hartford discounted or ignored medical information from Dr. Goddard that favored the continuation of benefits. When reviewing the appeal of an adverse benefit determination, employee benefit plans must provide a "full and fair review" of the participant's claim that takes "into account all comments, documents, records, and other information submitted by the claimant." 29 CFR § 2560.503–1(h). Further, "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment ... the appropriate named fiduciary shall consult with a health care professional who

has appropriate training and experience in the field of medicine involved in the medical judgment." 29 CFR §§ 2560.503–1(h)(3)(iii), 2560.503–1(h)(4).

Dr. Goddard is a highly credentialed and accomplished specialist, who had physically examined plaintiff on at least eight occasions, but his conclusions were rejected based solely on a file review by Dr. Onwubueke, an internist. Under the terms of the policy, Hartford had the discretion to conduct an independent medical evaluation of plaintiff. The Sixth Circuit has found that "where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman v. GE Group Life Assurance Co.,* 573 F.3d 383, 395–96 (6th Cir.2009). In this circuit, courts have found that reliance on one medical report in support of denial.to the detriment of a more detailed contrary report without further investigation was unreasonable. *McCauley,* 551 F.3d at 138; *see also Ross v. Verizon Communications, Inc.,* 837 F.Supp.2d 28, 52 (N.D.N.Y.2011) (a file review was inadequate where the administrator's dismissive treatment of the opinions of plaintiff's treating health care providers and its reliance on the opinions of health care professionals who never examined plaintiff was unreasonable).

■ An insurer is not required to obtain an independent medical evaluation in every case and may properly rely on a medical records review in evaluating a disability claim. *See generally Hobson,* 574 F.3d at 91. However, under the circumstances, Hartford's dismissive treatment of Dr. Goddard's medical opinion and its reliance on the opinion of a health care professional who never examined plaintiff is unreasonable, especially when, if Hartford were in doubt, it had the ability to require

Mr. Alberigo to be examined by a rheumatologist of its choosing. *See Ross v. Verizon Communications, Inc.,* 837 F.Supp.2d 28, 52 (N.D.N.Y.2011).

Hartford has unreasonably taken the position that Dr. Goddard's medical opinion should not be credited. This assertion is based on nothing more than Dr. Goddard's refusal to discuss Mr. Alberigo's medical condition over the phone with an unknown party, an action he believed to be in contravention of his legal obligations under HIPAA. He made a request to respond to Dr. Onwubueke's questions in writing. The record reflects that no attempt was made to comply with Dr. Goddard's request to respond in writing. Hartford has no sound explanation for why it simply did not fax Dr. Goddard a functionality and/or disability questionnaire at his request.

Hartford argues that it was under a time constraint and had only two days until the end of the 90 day period under ERISA to make a determination regarding the continuation of Mr. Alberigo's benefits. Under ERISA's 90 requirement, Hartford calculated that it had until February 15, 2009 to make a determination. However, Dr. Onwubueke did not speak with Dr. Goddard until February 13, 2009, at which time, Dr. Goddard indicated he would respond only to written requests for information. Considering that the record reflects that Hartford regularly made same day determinations regarding benefits, this reasoning appears disingenuous. In fact, on February 13, 2008, the same day that Dr. Goddard spoke with Dr. Onwubueke and requested to receive written questions, Dr. Onwubueke submitted his report to David Zych, and Mr. Zych sent out a letter to Mr. Alberigo's attorney denying the appeal. In the letter, he heavily emphasizes the timing constraints and the difficulties in communicating with Dr. Goddard as a justification for not following up with Dr.

Goddard. The argument that Hartford could not make one final attempt to solicit information from Dr. Goddard in writing because it only had two more days to make a determination is an insufficient explanation for its failure to follow-up with Dr. Goddard.

Most importantly, it provides no basis to completely discredit Dr. Goddard's medical opinion and his notes from clinical examinations of the plaintiff. Even without speaking to Dr. Goddard, Hartford was in possession of Mr. Alberigo's medical file. Hartford argues that it was justified in ignoring Mr. Alberigo's rheumatoid and arthritic conditions as documented by Dr. Goddard and Dr. Goddard's opinion regarding disability, because Dr. Goddard did not supply objective medical findings in support of his diagnosis. Hartford argues that Dr. Goddard's notes of physical examinations of plaintiff, contained in Mr. Alberigo's medical file, do not constitute objective medical findings in support of a finding of disability as required by the Plan. According to the Plan, "[o]bjective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [y]our disabling condition(s)." (26). To conclude that Dr. Goddard's findings, as documented in notes of clinical examinations, are not objective medical findings is irrational.

### D. No Review of the Social Security Administration's Findings

■ That Hartford gave no consideration to the SSA's determination that Mr. Alberigo was disabled and, in fact, did not review the SSA decision or file before reaching the conclusion that Mr. Alberigo is not disabled, is a factor to consider, although it alone is not determinative. *See Hobson v. Metropolitan Life Ins. Co.,* 574 F.3d 75, 91–92 (2d Cir.2009). In *Hobson,*

the plaintiff was granted disability from the SSA prior to a surgery for colitis. Following the successful surgery, the plaintiff's private insurer came to the conclusion that she was not disabled and terminated her benefits. *Hobson*, 574 F.3d at 92. The Court of Appeals found that there was substantial evidence supporting the insurer's decision, and declined to hold that the insurer's failure to explain its reasoning for arriving at an opposite conclusion from the SSA rendered its denial arbitrary and capricious. *Id.* The *Hobson* Court compared *Ladd v. ITT Corp.*, 148 F.3d 753, 755–56 (7th Cir.1998), where the Seventh Circuit reasoned that a claim denial was "irrational" where the claimant's medical condition worsened after the SSA awarded her benefits but before the plan administrator denied her ERISA benefits. *Id.* The record here establishes that this case is more akin to *Ladd*, than to *Hobson*.

As the Supreme Court said in *Glenn* when it approved of the decision making process used by the Court of Appeals in that case:

> In particular, the [Court of Appeals] found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous).

*Glenn* at 118, 128 S.Ct. 2343. (internal citations omitted). Here, as in *Ladd* and

*Glenn*, Hartford offered Mr. Alberigo legal assistance to obtain benefits when a finding of disability from the SSA would inure to its benefit, but ignored that finding in making its own determination. Since there was no improvement in Mr. Alberigo's heart condition between the time that the SSA made its determination and when Hartford denied him benefits, and he developed several rheumatoid conditions in that time, Hartford's failure to consider the SSA determination was unreasonable.

## III. Reinstatement of Benefits as Remedy

■ When a plan administrator "fails to provide an adequate reasoning, the proper remedy in an ERISA case ... is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Pastore v. Witco Corp. Severance Plan*, 196 Fed.Appx. 18, 21 (2d Cir. 2006) (*citing Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir.1998) (internal quotation marks and citations omitted)). In 2002, the Second Circuit explained that "remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon N.Y.*, 277 F.3d 635, 648 (2d Cir.2002) (internal quotations omitted); *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n. 4 (2d Cir.1996), *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995).

■ Here, based on the record, the decision to deny benefits was unreasonable. Additionally, the court has found that Hartford's conflict of interest corrupted the decision making process in this case. Under these circumstances, it would be fruitless to remand the appeal for fur-

ther findings or explanations. *See Zucker-brod v. Phoenix Mut. Life Ins. Co.,* 78 F.3d at 51 n. 4; *Solomon v. Metropolitan Life Ins. Co.,* 628 F.Supp.2d 519, 533 (S.D.N.Y.2009) (substantial evidence of disabling conditions and evidence of a conflict rendered remand a useless formality).

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is denied and summary judgment is granted to plaintiff awarding plaintiff the long-term disability benefit payments owed to him under the Plan retroactive to the date they were terminated. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**